## DIAZ et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 4812.　Decided July 21, 1932.　(13 P. [2d] 307.)

*Willard Hanson* and *A. H. Hougaard,* both of Salt Lake City, for plaintiffs.

*Geo. P. Parker,* Atty. Gen., and *Geo. H. Smith, R. B. Porter,* and *W. Hal Farr,* all of Salt Lake City, for defendants.

STRAUP, J.

An application was filed by Lorenza Diaz and Esther Diaz before the Industrial Commission against the Tintic Standard Mining Company, the employer, and the Continental Casualty Company, its insurance carrier, for compensation for the death of Cipriana Diaz. It was alleged Cipriana Diaz was an employee of the mining company, and that in the course of his employment he was accidentally injured by being caught between two mine cars and struck in the chest from which injuries he died four days thereafter and left surviving him Lorenza Diaz, his wife, and Esther Diaz, a minor about fifteen years of age, the granddaughter of his wife, but a member of the family of the deceased. The commission found all the issues in favor of the applicants; that the deceased was injured in the course of his employment; that his death was the result of such injuries and the family relations as alleged by the applicants, but found that they at the time of the death were living separate and apart from the deceased, and hence were not dependents, and on that ground and no other denied compensation; and, as by the statute in such case made and provided, Laws Utah

1921, c. 67, ordered that the mining company and its insurance carrier pay into the State Insurance Fund the sum of substantially $1,000. From the order denying compensation to the applicants they prosecute this review of the proceedings and seek an annulment of the order. The whole of the record of all of the proceedings had before the commission is certified and transmitted to us. It is the contention of the applicants that on the record the evidence without substantial dispute shows that they within the meaning of the Industrial Act were dependents, and that an award ought to have been made in their favor.

The statute, Comp. Laws Utah 1917, § 3140, as amended by Laws Utah 1919, c. 63, provides that:

"The following persons shall be presumed to be wholly dependent for support upon a deceased employee:

"(a) A wife upon a husband with whom she lives at the time of his death.

"(b) A female child or female children under the age of eighteen * * * upon the parent with whom he is living at the time of the death of such parent.

"In all other cases, the question of dependency, in whole or in part, shall be determined in accordance with the facts in each particular case existing at the time of the injury resulting in the death of such employee, but no person shall be considered as dependent unless a member of the family of the deceased employee," etc.

The deceased and Lorenza Diaz were married in California in June, 1915. The certificate of marriage was put in evidence. Esther, then an infant and a granddaughter of the wife, became, and until the death of the deceased was, a member of his family and was supported, treated, and regarded by him as though she had been his own child. The married couple as husband and wife continued to reside and live together in California for about two years, when they moved to Delta, Utah, where they resided and lived together for about four years, during which time the deceased most of the time was employed in beet fields, in a sugar factory, and did other work, receiving about $4.50

a day which was used by him in the support and maintenance of his wife and Esther and of himself. Witnesses who knew them at Delta testified that the deceased and his wife lived together happily and seemed to be attached and devoted to each other. The wife part of the time at Delta kept a sort of boarding house or took in boarders, the proceeds of which also were used in the maintenance of the family. From Delta the parties went to Dividend, Utah, where the deceased was employed by the defendant mining company, and where they without dispute lived together as husband and wife for about another four and a half years, Esther all the time living with them as a member of the family, and being supported, maintained, and sent to school by the deceased. Part of such time the wife also took in boarders or kept a sort of boarding house at Dividend. Witnesses also testified that during such period the deceased and his wife lived together happily and treated and regarded each other with affection and kindness. So far, there is no substantial dispute in the evidence, except there was some evidence to show that the deceased and his stepson, a son of the wife by a former marriage, at times had some disagreements, and that some complaint was made by the deceased because the wife used some money for the support of her mother.

The deceased left his employment at Dividend in May, 1926. About a month before that he took up quarters at the bunkhouse of the mining company where he slept, and generally boarded elsewhere than at his home, but during that time he paid the rent for the house occupied by his wife. The wife testified he left the employment and went to Butte, Mont., to look for work as a miner. No testimony was given by the employer or by any one as to whether the deceased was laid off or voluntarily left his employment, except that the employer's caretaker testified that, while the deceased was occupying quarters at the bunkhouse, he stated to him that, "I have got to leave this camp or I will kill that man." The witness was asked and answered: "Q. What man? A. The man that ruined his home. Q.

What man was that? A. Another man used to be around his house and that is why he moved to the bunkhouse, I suppose." The language as to the man referred to by the deceased was the language of the witness and not that of the deceased.

Another witness, a deputy sheriff, testified that the deceased told him in the spring of 1926 that "he was having family trouble; he said that there was another man trying to come in between he and his wife," and that he was going to leave because he did not want any trouble with "this fellow." Another witness testified that, while the deceased in his last illness was at the hospital and seriously ill, he was asked if he desired to have his wife notified, and he said not, that "she was no good." All such testimony was received in evidence over objections of counsel for the applicants.

The wife testified that there was no trouble between herself and the deceased, except little quarrels as heretofore stated, and that she and the deceased had lived together happily. In that she was corroborated by other witnesses living at Dividend. She further testified that, when the deceased left Dividend, there was no separation or severance of the family relation; that he left about May 24, 1926, to go to Butte to seek work as a miner, and there only part time was employed as a miner. The deceased returned to Dividend in June or July, 1927, and in the latter part of July of that year again entered the employ of the Tintic Standard Mining Company. In July or August, 1926, while the deceased was in Butte, the wife and minor child left Dividend and went to Virginia City, Nev. From there they visited her mother, who had gone to California, and then she and the child went to Bingham Canyon, Utah, about May, 1927. She testified that when her husband was in Butte she received three or four letters and moneys from him, and that she wrote letters to him. Neither could write, and each had others write for them. In that she was corroborated by her granddaughter, who then was about fourteen

years of age, and by a witness who testified that at Butte he wrote letters for the deceased to the deceased's wife, and that in some of them mention was made of sending money to her. The wife testified that in one of the letters written to her at Virginia City the deceased requested her to go to Bingham Canyon to see what she could there do towards acquiring or opening a boarding house, and that in response thereto she visited her mother in California and then went to Bingham in May, 1927. She further testified that, after the deceased returned to Dividend, she there on several occasions visited him, and he on week-ends visited her at Bingham, and that on such occasions he gave her money for the support of herself and child; and that on the last visit made by him in November shortly before his death it was contemplated by them that, if he could get work at Bingham, he would leave his employment at Dividend and go to Bingham. Other witnesses testified that they saw the wife at Dividend after her husband had returned, and another witness that he accompanied the deceased part way when the deceased was on his way to Bingham.

The wife further testified that on September 16, 1927, she was in Salt Lake City attending a Mexican celebration, and that on that occasion she met her husband and stopped with him at the house of friends, and that on such visit he gave her $140. Other witnesses testified to the same circumstance and that the deceased on such occasion gave her $140. One of the witnesses testified that he saw the deceased in Salt Lake City, he thought, on the evening of September 15. The pay roll of the mining company was put in evidence, which shows that the deceased at Dividend worked at the mine on eight hour night shifts from the 8th to the 17th of September, 1927, both inclusive, but did not work on the 18th. From that it is argued that the deceased on the 15th or 16th could not have been in Salt Lake City and at the same time work on night shifts on the nights of such days, and that hence the testimony given by the wife

and her witnesses that the deceased was in Salt Lake City on those days was not true, and it therefore was not true that he had given her $140 on such occasion. No witness testified that on either of the days in question the deceased was seen at Dividend or that he on either of such days was at Dividend, except as shown by the pay roll of the employer that he worked night shifts on such days.

It is the contention of the applicants that the testimony of the caretaker and of the deputy sheriff and the statement or declaration made by the deceased at the hospital with respect to his wife were hearsay and incompetent, and, in determining the sufficiency of the evidence to support the finding in question and the order denying compensation should be disregarded by us and the determination made alone upon the competent evidence adduced in the cause. We think the evidence referred to was hearsay and incompetent. It is clear such statements or declarations of the deceased were inadmissible on any theory of agency. Just as clear is it that they were inadmissible as admissions of a party to a cause or of one in privity with or under or through whom a party to the record based his claim or derived his right or title or of one otherwise identified in interest. Nor were such statements or declarations admissible on the theory of res gestae. Nor were they admissible as declarations against interest of one since deceased. To render declarations admissible in evidence as declarations against interest, it, among other things, was essenetial to show that they when made were against either a pecuniary or proprietary interest. It is clear the declarations were not against any such an interest or that they were even disserving. They were rather self-serving. Had the deceased declared or made a statement adverse to or against his interest as to the manner in which he received his injury, some statement or declaration tending to show his injury had not arisen out of or in the course of his employment, or that his disability was wholly due to an ailment or an affliction in no way attributable to an accident or to his

employment, let it be assumed without deciding the question, that such a declaration or statement might be regarded as against the declarant's pecuniary interest, for that, had he lived and claimed compensation for his injury, such a declaration would tend to affect his right to recover compensation. But the declarations here were not against either a pecuniary or proprietary interest. And, in the absence of a statute on the subject, the rule is firmly established in this country and in England that the declaration in such case, to be admissible must be against either a pecuniary or proprietary interest. *Smith* v. *Hanson,* 34 Utah 171, 96 P. 1087, 18 L. R. A. (N. S.) 520; 4 Chamberlayne on Evidence, § 2774 et seq.; 1 Elliott on Ev. § 441; 4 Encyc. of Ev. 87-89.

A statement may be said to be against a pecuniary interest when it tends to lessen the pecuniary value of property of the declarant or imposes upon him a pecuniary responsibility and is against a proprietary interest when it tends to cast doubt upon the ownership of property. 1 Elliott, supra. In no sense did the declarations here lessen or affect the pecuniary value of property of the declarant or impose upon him any pecuniary responsibility nor did they cast any doubt upon the ownership of property.

"An interesting problem," says the author in 2 Jones, Commentaries on Ev. (2d Ed.) § 917, has arisen in actions brought to recover damages for death by wrongful act where in some instances declarations of the deceased were received in evidence on behalf of the defendant. The author, however, says that each case must be examined so that, "under the generalization," statements of the deceased "forming a part of the res gestae may not be confounded with independent declarations." He cited Tiffany on Death by Wrongful Act, § 194. It there is said:

"Whether the declarations of the deceased are admissible in favor of the plaintiff will depend on whether they were made under such circumstances as to form part of the res gestae. It would seem that such declarations, if not admissible as part of the res gestae,

are not admissible in favor of the defendant as admissions, since the plaintiff in such case does not claim in the right of the deceased, but upon a new cause of action; but the point has been decided both in the affirmative and in the negative"—citing cases.

6 Thompson on Negligence, § 7738, also is cited, where it is said that admissions of a party against his interest are competent in negligence cases as in other cases, and that an admission in the case of one subsequently deceased that an accident was caused by his own fault or negligence was admissible against his administrator in an action for damages caused by his death under the Ohio practice in support of which a number of cases are cited from the Ohio court. Other cases may be found where in such actions declarations of the deceased, that he was to blame for the accident, or that it was his fault, or other adverse or disserving statement made by him as to the cause of the injury, were received in evidence on behalf of the defendant. However, there are a number of cases where in such actions such kind of declarations were held inadmissible. A leading case on the subject is *Dowell* v. *City of Raleigh*, 173 N. C. 197, 91 S. E. 849, 850. In holding that such declarations were inadmissible, the court there, among other things, said that: "The cause of action never arose until the death of the intestate, and then not to him, but to those who are designated by the statute to take the fund recovered. They acquire the right by the statute alone, and not because of any privity with the intestate, for none such exists between them, in any proper sense of that term." To the same effect are the cases of *Kansas City So. R. Co.* v. *Leslie*, 112 Ark. 305, 167 S. W. 83, Ann. Cas. 1915B, 834; *Marks* v. *Reissinger*, 35 Cal. App. 44, 169 P. 243; *Eldridge* v. *Barton*, 232 Mass. 183, 122 N. E. 272; *Louisville, etc., R. Co.* v. *Berry*, 9 Ind. App. 63, 35 N. E. 565, 36 N. E. 646.

We need not and do not now decide which of these rules is the better rule or the one sustained by the greater weight of authority, for that the declarations here made were in no sense declarations against interest, and certainly not

against any pecuniary or proprietary interest. As somewhat analogous here, reference may also be made to cases where it is held that under compensation acts the employee cannot by his own settlement with the other person release his wife's right under the act to compensation on account of his death, for that right is for her benefit and not for the benefit of the employee. *The Cripp Case*, 216 Mass. 586, 104 N. E. 565, Ann. Cas. 1915B, 828. To that effect also are *Jackson* v. *Berlin Const. Co.*, 93 Conn. 155, 105 A. 326; *Goodyear* v. *Davis*, 114 Kan. 557, 220 P. 282, 39 A. L. R. 563.

We thus are of the opinion that the testimony as to the declarations or statements of the deceased was hearsay and incompetent, and that, in determining the question of sufficiency of the evidence to support the finding of the commission that the applicants were not dependents, or whether such finding is against the evidence, we are not justified in considering such testimony and should as we do disregard it. But it in a way is urged by the defendants that the commission in determining the question of dependency had the right to consider such testimony, and that under the statute (Comp. Laws Utah 1917, § 3149) the commission was not bound by the usual common-law or statutory rules of evidence or by any technical or any formal rules of procedure "other than as by the act provided," etc. In support of that the cases of *Garfield Smelting Co.* v. *Ind. Comm.*, 53 Utah 133, 178 P. 57, 63, and *Rockefeller* v. *Ind. Comm.*, 58 Utah, 124, 197 P. 1038, are cited. The cases do not support the contention to the extent claimed. In the Garfield Case a statement is made that the commission in its investigations may have recourse to hearsay evidence, but at the same time the court in most emphatic language also said: "Yet when it makes its findings every finding of fact must be based on some substantial legal and competent evidence." In the Rockefeller Case it was held the commission there paid no attention to the "rule laid down in the Garfield Case," and that, in receiving hearsay evidence

and mere conclusions of witnesses, the commission "went far outside" the rule stated in the Garfield Case. Certainly neither by the statute nor by such decisions was it intended that the commission in receiving and considering evidence was at liberty to disregard the common-law or statutory rules of evidence and adopt those of Latin countries. While orders granting or denying awards will not be reversed or annuled nor findings set aside because of rulings of the commission in receiving incompetent evidence though it be of harmful effect and may have influenced findings, yet the rule in this jurisdiction is firmly established, and was followed before and since the decisions just referred to, that in determining the sufficiency of evidence to support a material finding or an order granting or denying an award or whether the finding or order is against the evidence, all incompetent evidence is disregarded by us and the determination made alone on the competent evidence; and, if a material finding is not supported by sufficient or is against the legal competent evidence, it will be disapproved and set aside.

Thus by eliminating the incompetent, and considering alone the competent, evidence, how stands the case? That the parties were married and as husband and wife lived together for about eleven years, during all of which time the deceased supported and maintained the applicants, and that they were dependent upon him for support and maintenance four and a half years of which the deceased was in the employ of the defendant company, is not disputed. Such a relation having been indisputably shown, together with the further indisputable showing that neither applicant at the time of or prior to the death of the deceased had any property, or any income of any kind other than from their own labors, it requires something more than mere conjecture or suspicion that such family relation and such presumed continued status at some time prior to the death of the deceased had so been severed or abandoned or changed as to justify a finding that the deceased had

abandoned his legal and moral obligation to support and maintain the applicants, that they acquiesced therein, and no longer looked to him for support and maintenance and expected none, and that, had the death not occurred, none would have been expected, requested, or received. Such conclusion is not justified from the mere fact that the parties at the time of the death, and for a year or more prior thereto, had not actually lived together in the same house or town or even in the same state. In a legal sense, and within the meaning of the statute, a husband and wife may well be regarded as living together, though, because of employment, engagements, or mutual convenience, they are living apart from each other. The statute of Pennsylvania provided that "no compensation shall be payable under this section to a widow unless she was living with her deceased husband at the time of his death or was then actually dependent upon him for support." In considering it, the Supreme Court of Pennsylvania in the case of *Creasy* v. *Phoenix Utilities Co.*, 276 Pa. 583, 120 A. 659, held that, where the separation is merely for the mutual convenience of the parties, and the wife is dependent, and the obligation to support her is either recognized or performed, the mere fact that the husband, for any reason, fails to perform that duty for a time, does not deprive the wife of her status as a dependent. If this were not so, the mere fact of separation, though perhaps for a proper and legitimate purpose, such as the future establishment of a new home, would, in all cases, bar a claim on behalf of the family. That it was not the intention of the Legislature to establish such a harsh rule seems amply proven by the fact that the word "dependent" was used, rather than make the right of the widow depend upon the fact of receiving support at the time of the accident. The criterion in cases of this character, consequently, must be whether or not a wife, living apart from her husband and dependent upon him, but not actually receiving support from him, has acquiesced in his action under circumstances amounting to a repudiation by him of his

legal obligation to support his family. To the same effect
are the following cases: *Coletrane* v. *Ott.* 86 W. Va. 179,
103 S. E. 102; *Muncie Foundry & Mach. Co.* v. *Coffee,*
66 Ind. App. 405, 117 N. E. 524; *Johnson* v. *Republic Iron
& Steel Co.,* 212 Ala. 149, 102 So. 44; *Bella City Malleable
Iron Co.* v. *Rowland,* 170 Wis. 293, 174 N. W. 899, 7 A. L. R.
1071; *Geytko* v. *Pittsburgh & E. Coal Co.,* 88 Pa. Super.
Ct. 522; *Shimkus* v. *Philadelphia & Reading Coal & Iron Co.,*
280 Pa. 88, 124 A. 335; *Landsrath* v. *Ind. Acc. Comm.,*
77 Cal. App. 509, 247 P. 227. In notes to and annotations
of cases in 13 A. L. R. 686, 30 A. L. R. 1253, 35 A. L. R.
1066, 39 A. L. R. 313, and 53 A. L. R. 218, references
may be found to numerous cases on the subject of "Depend-
ency Within Workmen's Compensation Act," including cases
of a variety of circumstances where the wife was living
apart from the husband and where in some she was held a
dependent and in others not.

Looking at our own cases on the subject, we find that in
the case of *Hancock* v. *Ind. Comm.,* 58 Utah 192, 198 P. 169,
it was held that under our Workmen's Compensation Act,
when there is no dispute as to the facts, the legal rights
deducible or inferable from such proven facts are questions
of law; that in determining them each case is dependent
upon its own facts, and no absolute rule can be laid down.
In the case of *McGarry* v. *Ind. Comm.,* 63 Utah 81, 222
P. 592, 594, this court, while not basing the question of de-
pendency alone upon the legal obligation of the employee
to support those depending upon him, yet emphasized such
obligation as a material factor in determining dependency.
There, the point was pressed that, if the employee failed
to support those dependent upon him, though legally obli-
gated to do so, no claim of dependency could be made. This
court declined to so hold, and stated that it was not in-
clined to so interpret the statute, and that "we know of no
authority which holds that the furnishing of support during
the life of deceased is absolutely essential to the establish-
ment of actual dependency." The court there further ap-

provingly quoted this language from the case of *Merrill* v. *Penasco Lumber Co.*, 27 N. M. 632, 204 P. 72:

"But just as the existence of the marital status does not of itself prove dependency, so the lack of actual support by the husband does not of itself negative dependency. The failure to support is only one circumstance for consideration. The reasons for it, the length of its continuance, the mutual attitude and means of the parties, the probable resumption of duty, and other similar matters may have a distinct bearing on the subject. If dependency were determined only by the fact of contribution to support, a wife and children might be dependent one week and cease to be the next according to the caprice of the husband and father. Such a theory lacks support from authority."

In *American Smelting & Ref. Co.* v. *Ind. Comm.*, 68 Utah 383, 250 P. 651, where the wife was held a dependent, it was observed that the mere fact that contributions from her husband may have ceased for a considerable time was not conclusive that he had abandoned his family and left them to shift for themselves. In the case of *Utah-Apex Min. Co.* v. *Ind. Comm.*, 64 Utah 221, 228 P. 1078, it was held that, where the wife lived apart from the husband, and where he had not contributed to her support for over four years prior to his death, she was not a dependent; but it there appeared she had made no effort to obtain support from him, that she did not know his whereabouts, and would not have exacted any support from him had she known where he was, and had not expected the deceased to support her. In the case of *Utah Apex Min. Co.* v. *Ind. Comm.*, 66 Utah 529, 244 P. 656, it also was held that the wife was not a dependent because of the peculiar facts shown in that case. There the parties were married in Idaho in October, 1918. They lived together but a short time. He had not supported her at any time during the marriage. In the following spring he went to Salt Lake City to join the Army, but in a few months was let out. The wife, to maintain herself, went to work in railroad shops and confectionaries in several towns in Idaho. In 1922 she went to Kansas, where she did canvassing to support herself and where she

lived for about two years. In the early spring of 1924 she went to Price, Utah, and there also supported herself by canvassing. The deceased died in Salt Lake County, Utah, in May, 1924. The parties thus lived separate and apart for three or four years prior to the death of the deceased. During all that time no communications were had between them and no effort made by her to locate or ascertain the whereabouts of her husband. They in effect lived as strangers to each other. She neither had not expected any support from him, and maintained herself as though she had not been married. When the husband died, his mother in August, 1924, as the sole dependent applied for, and in October, 1924, was awarded, compensation. Not until March, 1925, did the wife make any claim for compensation. She was denied compensation because she at no time was supported by the deceased; that during all the years in which she was separated from him she had not looked to him for support, had not expected any, had requested none, did not even know his whereabouts, made no effort to ascertain where he was, and thus it in effect was held that it was not reasonable to infer or probable that, had the husband lived, she would have received any support from him.

The facts in the two cases last cited and in this case are strikingly dissimilar. Here the parties lived together for eleven years, during all of which time the applicants looked to the deceased for support and maintenance, and were supported and maintained by him. When the deceased left Dividend and went to Butte, there is no substantial competent evidence to show nor to justify an inference that such family relation was not to continue or that by mutual consent it was so changed that the deceased no longer was required to perform his legal and moral obligation to support the applicants, or that they no longer were to be supported by him, or no longer expected to receive support from him, and that they from thence on were required to shift for themselves without aid from the deceased. We

do not see anything in the record to justify any such inference or conclusion. None such is justified, because the parties lived apart from each other for about a year and a half, about one year of which the deceased was in Butte. Further, the evidence shows that during the time he was in Butte he and his wife corresponded with each other, and that she received moneys from him, and, when he returned to Dividend, they visited each other, and on such occasions he also gave her money for the support of herself and of the minor child. That evidence does not rest alone upon the testimony of the wife. Her testimony in such respect was corroborated, at least in most particulars, and is not disputed except as to the occasion when the wife and the witnesses testified she met her husband in Salt Lake City at a Mexican celebration and that he then gave here $140, and disputed only by the pay roll of the employer as heretofore indicated.

It of course is argued that the commission was not required to believe the testimony of the wife as to the correspondence between her and her husband, the visits had between them after his return from Butte and as to the moneys received by her from him, though corroborated in the main by other witnesses. Certainly, great latitude is possessed and accorded the commission in determining the credibility of witnesses and the weight to be given their testimony; but, the rule being founded in reason, is not an absolute or an inflexible one. The commission was in duty bound to fairly and impartially consider all the evidence relating to a material issue, and was not permitted to single out some portion of it and give it undue weight to the exclusion of other evidence of equal importance. If in some particulars evidence is in apparent conflict, it is the duty of the commission to reconcile the evidence if that may be done consistently with the truthfulness of the testimony. The commission may not arbitrarily or capriciously disregard evidence or disbelieve testimony. When the commission disbelieves the testimony of a witness, there must be some

apparent reason therefor. The rule in such respects is stated in the case of *Rukavina* v. *Ind. Comm.*, 68 Utah 1, 248 P. 1103. Because a witness has a direct interest in the litigation is a matter of course, to be considered in determining the weight to be given his testimony, but does not in and of itself justify disregard or disbelieving his testimony. There must be something in addition thereto to justify a disbelief or rejection of it. *Hull* v. *Littauer*, 162 N. Y. 569, 57 N. E. 102. We think there was no sufficient reason made to appear to have justified the commission in disbelieving or rejecting the testimony of the wife, if it was disbelieved or rejected by the commission.

Further, still more conclusive is the proposition that, inasmuch as it indisputably was shown that the parties for eleven years had lived together as husband and wife, and she and the minor child dependent upon the deceased for support, and during all of that time were supported and maintained by him, and that neither at any time during the marriage had and do not now have any property or income of their own or any means of support, though the parties for a considerable time, for a year or more, lived apart from each other without any showing that such living apart was a discontinuance of the marriage relation and not again to be resumed or was under circumstances where the wife without the fault of the husband had abandoned the family relation, and though during such period she received no support from the deceased, nevertheless she and the minor child within the meaning of the statute were dependents, unless they, in not receiving support from the deceased, acquiesced in his action under circumstances amounting to a repudiation of his legal obligation to support his family and the applicants no longer looking to him for support, none of which was here made to appear. Eliminating the incompetent evidence, for aught made to appear, the separation of the parties was merely temporary for their own convenience or under conditions requiring temporary separation. Under such circumstances, the fact, if it was the

fact, that the wife and children for a year or more prior to the death of deceased received no support from him, would not justify a finding that they were not dependents under the statute and not entitled to compensation. Let it not be minimized nor pushed aside that the rights of the dependents specified in the statute were created for their benefit independently of the rights of the employee, so and as the authorities teach, they may not become a public charge, and such rights should not be denied them, unless clearly forfeited or abrogated by them.

Thus, whether the case be regarded as falling within subdivision (a) or (b) of the statute referred to, we are of the opinion that the finding that there were no dependents is against and contrary to the legal competent evidence in the case, and hence it is disapproved and set aside.

There is another point urged by the defendants. They by cross-assignments contend that, regardless of the question of dependency, the order denying an award should be affirmed on the ground that the legal competent evidence is insufficient to sustain the finding that the deceased sustained any injury in the course of his employment or that the death resulted from injury. With respect to such issue, there was some hearsay evidence which we exclude and do not consider. It is shown that at about 9 o'clock p. m. on November 29, 1927, the deceased, engaged as a mucker in underground mining, reported to the shift boss of the mining company, and complained of pain in his chest, stating that he had been caught between two moving mine cars and asked for medicine. He had an abrasion or contusion on the chest. The shift boss put mercurochrome on the wound, and the deceased went back to work. At about two hours thereafter he again reported to the shift boss still complaining of pain, and was sent to the surface by the shift boss, with directions that he report to the attending physician of the company at the mine. He next day by the attending physician was sent to a hospital at Salt Lake City, where on December 3d he died, the immediate cause of death being pneumonia.

Under the statute, the employer is required to make and file a report with the commission of all accidental injuries of his employees arising out of or in the course of their employment. On December 3, 1927, the defendant mining company made, and on December 5th filed, such a report with the commission wherein, among other things, it was stated that the deceased was in its employ, that he was injured November 29th while engaged as a mucker in underground mining by his chest being caught between two moving mine cars, and that the extent of the injury was a contusion and an abrasion of the lower left chest. On the same day, December 3d, the attending physician also made a similar report to the commission, with the statement that the employee the next day was sent to the hospital at Salt Lake City, and that "this man developed pneumonia as soon after he discontinued work." These reports without objection were put in evidence. A further statement or report of the company also was put in evidence, which shows that the deceased from July 23, 1927, after he had returned from Butte and up to November 29th, was a steady worker, "and so far as we know was not off work due to sickness." Such statements or admissions of the defendant company are alone sufficient to sustain the finding of the commission that the deceased sustained an injury in the course of his employment. *Craciola* v. *Lewis et al.*, 233 App. Div. 437, 253 N. Y. S. 752; *Anthus* v. *Rail Joint Co.*, 193 App. Div. 571, 185 N. Y. S. 314; Id., 231 N. Y. 557, 132 N. E. 887; *Lanni* v. *Amsterdam Bldg. Co.*, 217 App. Div. 278, 216 N. Y. S. 763; *Hege & Co.* v. *Tomkins,* 69 Ind. App. 273, 121 N. E. 677; *Peterson* v. *Richards,* 73 Utah 59, 2772 P. 229. The admissions so made may be of fact or of law or of mixed fact and law. The competency or relevancy of them cannot be affected by the question whether the party making them had personal knowledge or merely information as to the fact admitted. The New York cases just cited.

There is some conflict in the evidence as to whether the injury was the direct or a contributory cause of the death. There was evidence to show that the deceased several days

prior to the injury suffered from a cold, coughed some, and complained of being sick, but worked every day up to the time of the injury. The autopsy did not disclose any injury to any of the internal organs. Different opinions were expressed by medical expert witnesses as to whether pneumonia, which was the direct cause of death, was attributable to the injury. The attending physician at the mine testified that he had treated the deceased for a cold some time before the injury, but that he had fully recovered from such ailment. He further testified that, when he first examined the deceased on the 29th after the injury, he did not discover any definite sign or symptom of pneumonia, but did so on the next day, and then sent the deceased to the hospital. The shift boss testified that up to the time of the injury the deceased, so far as he could see, was able to do his work, and that no complaint was made by the deceased until after the injury. We think there is sufficient evidence to justify the finding that pneumonia resulted from the injury, or at least that the injury was a contributing cause.

The order denying compensation is thus set aside, and the cause remanded to the commission for further proceedings.

ELIAS HANSEN, J.

I, too, think the ward made by the Industrial Commission should be annulled.

In this proceeding defendants raise the question of the sufficiency of the evidence to support that finding of the commission wherein it was found that Cipriana Diaz died as the result of an injury which he received while employed by the Tintic Standard Mining Company. I am of the opinion that the evidence does not support the finding thus complained of by the defendants. The evidence touching the cause of the death of Cipriana Diaz is in substance as follows: P. O. Pearson testified that on November 28th, the day before it is claimed Mr. Diaz received his injury, he came to Mr. Pearson for his laundry. That at that time Mr. Diaz said he was sick in here, indicating his

lower chest; that he could not carry his laundry down to the railroad track, a distance of about 200 yards. Victorei de Elizondo testified that the deceased boarded with her at the time he was injured. That about three days before he was injured he told her he was feeling sick. Bruno Elizondo testified that about two or three days before Mr. Diaz was injured he told him he was feeling sick. Serafin Corral testified that he saw Mr. Diaz in his bunkhouse two days before he was injured, and that he did not appear to be sick. A. A. Wetterstrom testified that he was the shift foreman of the Tintic Standard Mining Company in charge of the shift on which Mr. Diaz worked. That on November 20th, about 9 o'clock in the evening, Mr. Diaz came to him (Mr. Wetterstrom), and stated that he (Diaz) was caught between two cars and squeezed, and that he wanted some medicine. He had a little scratch on the left side near the chast line and another on the left side near the shoulder. That Mr. Wetterstrom applied some mercurochrome to the abrasion, and Mr. Diaz went away apparently satisfied. That at about 11 o'clock Mr. Diaz came to Mr. Wetterstrom again, and said that he was in pain. That he appeared to be in pain. That Mr. Diaz was then sent out of the mine and was told to report to Dr. A. E. Callaghan. Mr. Wetterstrom testified that he made a written report to the defendant mining company, but the report was not offered in evidence. Mr. Wetterstrom later made a report to the commission, which reads as follows:

"Diaz came to me about 9:00 o'clock on the night of November 29th, 1927, and claimed that he had been jammed between two cars. He had a slight scratch on his left side just above the hip. I put some mecurochrome on the scratch and he was satisfied. He then went back to work pushing cars as usual. At about 11:00 o'clock he came to me and complained of pain in his left chest and on the back of his left shoulder so I sent him to the surface to Dr. Callaghan. It was my opinion at the time that Diaz was not hurt."

Mr. Wetterstrom further testified that during the time Diaz was working at the mine he frequently complained

about some kind of pain. He was coughing more or less all the time, and appeared to be in his usual condition of health before the time he claimed he was injured.

Dr. A. E. Callaghan testified that he treated Mr. Diaz about midnight following the day he is alleged to have been injured; that at that time Mr. Diaz had a small abrasion near the niple over the left chest; that he had a temperature of over a hundred; that there was evidence of a pleurisy over the bases of both lungs, particularly over the lower part of the left lung; that he showed evidence of what is called moisture; he had trouble, probably infection in the lung, indicating a condition of pleurisy; that on the following day "I made an examination of his lungs and he had definite evidence of pneumonia." Dr. Callaghan further testified that minor injuries such as he found on Mr. Diaz would not in his opinion, cause or have a tendency to aggravate or change the course of an incipient pneumonia; that in his opinion Mr. Diaz started to develop pneumonia some few hours before he was first examined by the doctor. Dr. Callaghan made a report to the Industrial Commission in which he stated that Mr. Diaz was injured "while working underground; man's chest was caught between two bodies of two moving cars." The defendant mining company, by its secretary made a similar report to the commission.

On the afternoon of November 30th Mr. Diaz was taken to the Holy Cross Hospital at Salt Lake City. He arrived at the hospital at about 7:30 p. m. Dr. Martin C. Lindem attended him during the time he was in the hospital. Dr. Lindem testified that Mr. Diaz was very sick when he arrived at the hospital; that he had a temperature of 103.2, Fahrenheit, pulse 110, had a hacking cough, and complained of severe pain in his left chest; that he was suffering from influenza pneumonia; that he had "a very superficial abrasion through the outer layers of the skin and I should judge that the diameter of the area would be about the size of a 10 cent piece; there was mercurochrome thickly applied to the skin of the area which would make one think

the abrasion was larger, but the abrasion was confined to a small solitary spot." Mr. Diaz died December 3d at 4:30 p. m., three days after he was received at the Holy Cross Hospital; that the day after his death an autopsy was performed on his body by Drs. Lindem and Calonge. They both testified that there were slight abrasions of the skin on the left side of the chest, but that a careful examination of the outer surface of the ribs and of the ribs did not disclose any contusions opposite the abrasion of the skin; that there was no evidence of any internal injury to support the claim that the deceased has sustained an injury to the left chest. When Dr. Calonge was asked whether in his opinion the abrasions found on the skin could have contributed in any way to the death of Mr. Diaz, he testified: "These superficial abrasions were insignificant and so entirely insignificant that it borders on the ridiculous to consider them. They were minor things that could be caused by a man's finger nails. They in no way affected the tissues underneath. There was no evidence whatsoever of any contusions beneath these abraisions. A man might turn himself over a sheet, or scratch his body with his finger nails in a way that would result in so-called abrasions."

Dr. Calonge further testified that, before an injury can cause or contribute to pneumonia, it must be such an injury as to leave some evidence of force either on the lungs or the tissues overlying the lungs. "My diagnosis, to sum it up in brief, was a plain and absolutely positive case of influenza pneumonia with the contributory factor of well defined advanced degenerative changes in arterial vasicals from syphilis. I say contributory, for the simple reason that any arterial disease in pneumonia increases the probabilities of fatal result."

The testimony of Dr. Lindem was to the same effect as that of Dr. Calonge. Each expressed the opinion that the injuries found on the body of Mr. Diaz did not and could not have caused or contributed to the influenza pneumonia from which he died.

On December 14, 1927, Drs. L. L. Daines and R. B. Stevens, at the request of Mrs. Diaz, performed an autopsy on the body of Mr. Diaz. Dr. Daines testified that they found on the body of deceased several light and fairly recent abrasions over the chest and also the abdomen; that they were mostly on the lower part of the chest and left upper abdomen; that these excoriations were merely superficial abrasions; that "the abrasions were very superficial, just little scratches there. No deep ones. They had been painted apparently with mercurochrome and they did not appeal to us as being very deep abrasions, just superficial scratches or excoriations." Dr. Daines further testified that they did not find any evidence of any injury on the body of Mr. Diaz other than the superficial abrasions, and that the abrasions found could have been caused by scratching with the finger nails; that because of the length of time that elapsed between the death of Mr. Diaz and the autopsy it was impossible to tell as to whether the tissue of the body had or had not been injured.

The testimony of Dr. Stevens with regard to what was found in performing the autopsy of the body of Mr. Diaz is to the same effect as the testimony of Dr. Daines. Several hypothetical questions were asked of Drs. Daines and Stevens. The following are typical of the questions asked and answers given, Dr. Daines testifying:

"Q. Was there anything there that you discovered by which you would be able to say, even in a remate way, as to the force of the trauma that might have produced these abrasions or bruises? A. It would be very difficult to determine that because a severe injury at times may not break the skin.

"Q. Let us assume that he (Diaz) may have had a pneumonia germ as he was working on the 29th day of November, 1927; then he receives a trauma in the vicinity where you indicated you saw the abrasions; would you say that, by reason of that, there would be a tendency to lower his resistance so that his pneumonia would come upon him to a more aggravated extent or degree than would otherwise be the case? A. I think that would have to depend upon the amount of trauma there was, the severity of it. I think, however,

there is possibility of severe trauma to lower resistance sufficiently to bring on pneumonia in this case.

"Q. Assume on the 29th day of November, he had received this injury, this crushing injury whatever it may have been, a trauma of some kind to the chest. Can you associate the injury and his condition, the assumed injury? Assuming that that is a fact that that would have a tendency to create a condition of that character? A. I am sure I could not say from the evidence I saw at post mortem, that we could state there had been enough injury there to produce lowering of resistance sufficient to actually cause pneumonia.

"Q. Assume he (Diaz) was caught in between two mine cars in the Tintic Standard Mine, working there on this particular day, the 29th day of November. He was caught in between the two mine cars and received what we might call a crushing injury; there may not have been any ribs broken; there may not have been any other organs particularly disturbed, that is as far as a break might be concerned, but that it was a crushing injury. That particular type of injury, don't you think, would have a tendency to accelerate a condition of pneumonia that may have existed? A. I think there is a possibility; that is my best judgment on that.

"Q. We could speak of probabilities? A. Yes, I think probably it could.

Q. You might say the probability is it lowered his power of resistance and that that germ would work very rapidly under those circumstances? A. I think there is a probability there.

"Q. Assuming that this man was injured in the Tintic Standard Mine on the 29th day of November, 1927, and that he died on December 3rd; and from the investigation that you conducted, the autopsy that you performed together with Dr. Stevens, what would you say as to whether or not that pneumonia had commenced prior to or subsequent to the 29th day of November, 1927, if you can say? * * * A. I think we cannot say that that pneumonia began after November 29th.

"Q. Suppose that this germ was present in the lung prior to this time and he then received an injury of sufficient force to cause the abrasions which were apparent to you at the time of performing this autopsy; wouldn't you then say that, in your opinion, Doctor, the trauma contributed materially to his condition, his pneumonia condition? A. In my opinion there is a brobability that the trauma did contribute to the pneumonia.

"Q. And accelerated the condition that was, possibly, present at this time? A. Yes, sir. * * *

"Q. Assuming he was working on the 29th day of November, 1927, when he received a trauma of some character, some injury to the

chest, that he died on the 3rd day of December, 1927, a period of only 4 days after that trauma; as a matter of fact and in your opinion as a pathologist, that trauma was a contributing factor to his death? A. I would rather put it that there is a probability that it could be a contributing factor.

"Q. As to whether it was or not is problematical, Doctor? A. Yes. * * *"

## Dr. Stevens testifying:

"Q. Assuming that this person on whom you performed this autopsy was working in the Tintic Standard Mine on the 29th day of November, 1927, and on that date received a certain traumatic injury to his chest; that he was caught between two mine cars in such a way as to cause a blow of some kind to the chest and that he died on December 3, 1927, as a result of bronchial pneumonia; now, would you say that there was any connection between the traumatic injury, Doctor, and the pneumonia which later caused his death? A. There could be.

"Q. And what about the probabilities of there being a connection between the two, Doctor, and how would you describe it and draw your conclusions in the case? A. Associating the pneumonia and the conditions that we found at the autopsy following an injury four days previous, I would say that that could lower the resistance, that is the injury could lower the resistance to the extent that pneumonia could develop if it had not already developed before that.

"Q. Assuming, Doctor, that there was a severe traumatic injury of some kind to the chest as we have described it; that this man alleges that he was caught between two mine cars, it is alleged by the petitioner here that he was caught between two mine cars and he received a blow to his chest. Now, assuming that, what would ordinarily be the result, Doctor, of a predisposing cause in an injury of this character—and I will ask you to describe it in your own way—in its effects and relationship to pneumonia? A. An injury to the chest as you stated would materially lower the resistance, enough so that pneumonia could develop or if it had already developed, it would accellerate the germinating stage more readily.

"Q. When you speak of superficial abrasions, you merely mean abrasions that show outside? A. A break in the skin.

"Q. And shows on the outside? A. Oh, yes.

"Q. And you say it is very difficult to tell the force of the blow? That is true? A. Entirely so.

"Q. But, if there is a crushing injury that means an injury of considerable force, doesn't it? A. Yes, sir.

"Q. And that creats more than external injury, doesn't? A. No, not always.

"Q. If you had considerable force behind the blow, wouldn't that create something that you would determine and find in the interior? A. Usually so but in this particular case it was such that we could not determine that at all.

"Q. You did not find any evidence of injury other than the ones shown on the outside? A. We could not tell on account of the previous autopsy and the length of time; the tissues were such it was impossible to tell."

There were other hypothetical questions asked and similar answers given. The questions and answers above quoted are sufficient to show the purport of the testimony of Drs. Daines and Stevens.

Before the defendants may lawfully be required to pay anything to either the applicants or the State Insurance Fund, it must affirmatively appear from the evidence that the death of Mr. Diaz was caused by an injury which he received while in the employ of the Tintic Standard Mining Company. It is conceded by all of the parties to this litigation that the immediate cause of his death was pneumonia, probably influenza pnenmonia. If the pneumonia from which he died was caused by an injury which he received while working at the mine, or if the deceased was afflicted with pneumonia, and while so afflicted received such an injury as to render fatal the disease which, without the injury, would not have been fatal, then the defendants are liable, otherwise not. Assuming there is sufficient competent evidence in this case to show that Mr. Diaz received an injury while working at the mine, yet to authorize an award the further burden remained on those who claimed compensation or the right to require the defendants to pay money into the State Insurance Fund to show that such injury caused the death of Mr. Diaz. The evidence in this case shows without conflict that the injury, if any, which Mr. Diaz received while working at the mine, was merely an abrasion of the skin, such an injury as

might well have been caused by the deceased scratching himself. Such is the effect of the testimony of Mr. Wetterstrom, the foreman of the mine; of Dr. Callaghan who examined him when he came out of the mine; of Dr. Lindem who attended him in his last illness at the Holy Cross Hospital, and who, together with Dr. Calonge. performed an autopsy on his body the day after his death; and such also is the testimony of Dr. Calonge. The testimony of Drs. Daines and Stevens tends to corroborate, rather than refute, the testimony of the other witnesses as to the nature and extent of the injuries, if any, which Mr. Diaz received while at work for the defendant mining company. They did not perform an autopsy until eleven days after the death of Mr. Diaz, and therefore, according to their testimony, it was difficult for them to ascertain whether or not any of the tissue had been injured. The only evidences of any injury that they found were the slight abrasions of the skin which were testified to by the other doctors and by Mr. Wetterstrom. Therefore, the only conclusion permissible upon this record is that the injuries, if any, received by Mr. Diaz while working for the defendant mining company were very slight, superficial scratches or abrasions of the skin, such as might have been caused by being scratched by a man's finger nails. The testimony of Drs. Callaghan, Lindem, and Calonge is to the effect that such injuries did not and could not cause or contribute to the disease which admittedly was the immediate cause of death. The testimony of Dr. Daines and likewise that of Dr. Stevens, when considered as a whole, is not in conflict with the testimony of the other doctors. Answers to hypothetical questions not founded upon, but contrary to, the established facts in a case, can have no probative value. What would have been the probable effect upon Mr. Diaz if he had received a severe or crushing injury at the time of the alleged accident can be of no aid in determining what was the probable effect of the slight, superficial skin injuries which he had immediately after the alleged accident. In the main, the hypothetical questions

asked Drs. Daines and Stevens were not bottomed upon such injury as the evidence shows Mr. Diaz actually had at the time he was fatally stricken with pneumonia, and therefore the answers to such questions do not raise any substantial conflict in the testimony. Nor is there anything in the surrounding circumstances of the alleged injury of Mr. Diaz which shows that he received such an injury as was calculated to cause pneumonia or render the disease fatal which, without the injury, would not have been fatal.

For these reasons, I am of the opinion that the order directing the defendants to pay $998.40 to the State Insurance Fund should be annulled.

**CHERRY, C. J.**

I concur in annulment of the award for reasons stated by Mr. Justice ELIAS HANSEN.

**FOLLAND, J.**

I concur in the annulment of the award for the reasons stated by Mr. Justice Hansen.

**EPHRAIM HANSON, J.**

I concur in the opinion written by Mr. Justice Hansen.