## RUTHRAUFF et al. v. SILVER KING WESTERN MIN. & MILL. CO. et al.

No. 5927.   Decided June 9, 1938.   (80 P. 2d 338.)

*R. J. Hogan,* and *George Jay Gibson,* both of Salt Lake City, for appellant.

*Critchlow & Critchlow,* of Salt Lake City, for respondents.

*C. Ray Bradford* and *Chas. M. Morris,* both of Salt Lake City, for defendants and cross-appellants.

HANSON, Justice.

This is an action by plaintiffs above named against all the defendants to quiet their title to an undivided one-fourth interest in the Augusta Lode Mining Claim, U. S. Lot No. 122, situate in Big Cottonwood and Uintah Mining Districts in Salt Lake and Summit counties. The defendant corporation will be referred to herein as the Silver King, and the remaining defendants in a group as "Anderson, et al."

The Silver King answered separately and counterclaimed to quiet its claim of title to the entire mining claim. The defendants Anderson et al. answered and counterclaimed for substantially a one-eighth undivided interest in the claim. Answers and replies were filed by each group against the others, and the issues were tried by the court, which found and decreed a one-eighth interest to the plaintiffs, a seven-eighth interest to the defendant Silver King, and no interest to the defendants Anderson et al.; quieting the title accordingly.

The Silver King has appealed from so much of the decree as awards any interest to the plaintiffs, while the defendants Anderson, et al., have cross-appealed from the disallowance by the decree of any interest to them. Errors and cross-errors are assigned respectively.

The evidence at the trial was chiefly documentary in the form of deeds and records in the chain of titles. In these documents and in the trial court's findings and decree, the linear foot is often or chiefly used as the unit of measurement of interests of the owners, though the equivalent thereof in fractional undivided interests is sometimes employed.

· The Augusta Lode Mining Claim was located November 5, 1879, 1500 feet in length by 600 feet in width, by John G. Kennedy (750 feet), E. Covington (375 feet), and Samuel Edgerly (375 feet). Thereafter, sundry conveyances were made by the locators and their grantees so that at the time of the final certificate of purchase issued by the Land Department on application for patent, the record title appeared

to be held in undivided ownership by the following named persons in the proportions represented by the number of linear feet set opposite the name of each person viz.:

|  | Feet | Inches |
|---|---|---|
| S. Edgerly | 94 | 3 |
| Hannah J. Kennedy | 750 | 0 |
| John Seager | 186 | 6 |
| Charles M. Wyman | 93 | 9 |
| Charles C. Ruthrauff | 187 | 6 |
| George H. Wyman | 93 | 9 |
| E. Covington | 94 | 3 |
|  | 1500 | 0 |

On July 12, 1881, John G. Kennedy, John Seager, Charles M. Wyman, Charles C. Ruthrauff, and George H. Wyman made application for a mineral patent for said Augusta Lode. On November 22, 1881, the United States Land Office at Salt Lake City issued its Receiver's receipt to John G. Kennedy acknowledging full payment, and on the same day its final certificate of purchase of the 20.66 acres embraced in the mining claim to and in the name of the above named applicants. Thereafter, and before patent, to wit, on December 8, 1882, Hannah J. Kennedy and her husband John G. Kennedy conveyed to Louis G. Hurlburt an undivided 375 feet interest.

On December 15, 1882, the United States patent was issued to the above named applicants, which cast upon them the full legal title to said mining claim. Presumptively on the face of the record the undivided interest of each of the five patentees would be one-fifth, or 300 feet. But if restrained to the actual record interest of each as denoted by the prior conveyances, their respective interests at that time, as between themselves and their excluded co-owners, would be as follows:

|                        | Feet  | Inches |
|------------------------|-------|--------|
| John G. Kennedy        | 0     | 0      |
| John Seager            | 186   | 6      |
| Charles M. Wyman       | 93    | 9      |
| Charles C. Ruthrauff   | 187   | 6      |
| George H. Wyman        | 93    | 9      |
|                        | 561   | 6      |
| Excluded co-owners     | 938   | 6      |
| Total                  | 1500  | 0      |

In disposing of the claims of the plaintiffs, who claim as heirs at law of Charles C. Ruthrauff, deceased, we go back to the beginning of his interests, which antedate the patent. On July 1, 1880, Samuel Edgerly (being then the owner of a 281-foot 9-inch interest) conveyed to said Charles C. Ruthrauff and George H. Wyman an undivided 187 feet 6 inches thereof, retaining 94 feet 3 inches. The effect of this deed is in dispute between the parties, especially between the defendants Silver King and Anderson, et al., to which we later recur in disposing of the cross-appeal. For the present we notice it only in its effect on the Ruthrauff interest. Thereby we hold the said Ruthrauff and George H. Wyman became each the owner of one-half of the undivided interest conveyed, or 93 feet 9 inches each.

On September 23, 1880, Charles M. Wyman (being then the record owner of an undivided 187 feet 6 inches of the claim) conveyed to said Charles C. Ruthrauff an undivided 93 feet 9 inches thereof, retaining a like interest. Thereby the said Ruthrauff became the owner of a total of 187 feet 6 inches interest on the basis of the records. Ruthrauff continued to own and hold this interest to at least as late as December 18, 1902, and it became either all or a part of his interest under the patent, as we may have occasion to consider later.

In 1898, the Augusta Lode was assessed and sold for taxes levied in that year by Salt Lake County, and bought in by the County. In plaintiffs' brief, and in the trial court's findings, it is stated that on July 1, 1901, this tax sale certificate was by the County sold and assigned to the said Ruthrauff. We do not find in the record evidence of this fact but for the purpose of our decision we treat it as both true and proved. This tax sale and all the proceedings thereon were and are void on their face. All the parties agree about this, so we need not point out the details of invalidity.

We digress now for a moment to trace out the concurrent record interest of one Rose Brown, whose dealing with the said Ruthrauff will presently appear. On November 17, 1899, John Seager (who then owned only 186 feet 6 inches interest, unless such interest as it is contended he then held in trust for co-owners excluded from the patent be treated as enlarging the estate which he could convey), by his deed, Exhibit 12, purported to convey to the said Rose Brown an undivided one-fourth (375 feet) interest in the claim. She continued to hold such interest as she thereby acquired until after the tax sale proceedings in 1898 to which we have referred. Claiming to own a one-fourth interest under the John Seager deed, Rose Brown on November 30, 1902, redeemed a one-fourth interest in the claim from the 1898 tax sale by paying to the County one-fourth of its tax bill.

On December 18, 1902, said Charles C. Ruthrauff and Florence B., his wife, executed and delivered to the said Rose Brown their quitclaim deed, Exhibit 13, for a recited consideration of one dollar, whereby it was expressed that the first parties,—

"* * * do hereby remise, release and quitclaim unto the party of the second part, her heirs and assigns forever, all an undivided one-fourth interest in that certain lode mining claim known as the Augusta Lode. mining claim * * * lot No. 122, [district, county and state].

"Together with the appurtenances and all the estate and rights of the parties of the first part in and to the said premises.

"To have and to hold the described premises unto the said party of the second part, her heirs and assigns forever."

Thereafter, on May 28, 1903, said Charles C. Ruthrauff took an Auditor's Tax Deed (Exhibit 44) from the County for the remaining three-fourths' interest not redeemed by Brown. He thereby acquired no right, title or interest in the claim because of the invalidity of the tax sale.

So far there is no disagreement about the facts stated. But there is disagreement about the effect and consequences of the said deed, Exhibit 13, above quoted from. Plaintiffs claim that the intent, purpose and effect of that deed was merely to release to Rose Brown from the operation and effect of the tax sale and assignment of the certificate of purchase from the County, the one-fourth interest in the mining claim which she previously had, or claimed to have acquired, under her deed from John Seager of November 17, 1899, and that it was not thereby intended to convey to Rose Brown any interest that the grantor Ruthrauff had before or at the time of the 1898 tax sale. The Silver King, on the other hand, claims that the Ruthrauff deed was operative to convey to Rose Brown whatever interest Ruthrauff then had, be it an undivided one-fourth interest or less. In any event, the deed was for a greater interest than Ruthrauff then had (unless his increased interest denoted by the patent and claimed by others to be by him held in trust for his excluded co-owners be considered as enlarging the estate or interest which he could convey by the deed, Exhibit 13).

In support of the first theory mentioned, plaintiffs have recourse to many matters beyond the face of the deed itself. This is not permissible unless the intent and meaning of the deed is upon its face uncertain or obscure. In determining intent, we are restrained to the language employed, —to the chosen vehicle of the thought and purpose of its author. If the meaning is clear, we may not resort to extraneous aids to interpret, modify, add to, or sub-

tract from its meaning. To do so would be to assume the function of making contracts for the parties under the guise of interpretation, a power not delegated to the courts. It would seem superfluous to cite authorities to so primary a teaching as this. But reference is made to the text and foot notes in 22 C. J., at pages 1075, 1077, 1083, 1092-3, 1098, 1133, with copious citations of cases from all the states.

We find no uncertainty of meaning in the deed, Exhibit 13. The operative words therein, "remise, release and quit-claim," have often been judicially defined and applied. They are words of conveyance and are effective to pass the grantor's title, if any, to the grantee. They are not mere words of release, whatever may be the meaning of "release" when employed alone. *McAnaw* v. *Tiffin*, 143 Mo. 667, 45 S. W. 656; *John Doe ex dem. Murray McConnell* v. *Maro M. M. Reed*, 4 Scam. 117, 5 Ill. 117, 38 Am. Dec. 124; *Brown* v. *Banner Coal & Coal Oil Co.*, 97 Ill. 214, 37 Am. Rep. 105; *Wholey* v. *Cavanaugh*, 88 Cal. 132, 25 P. 1112; *Wilson* v. *Albert*, 89 Mo. 537, 1 S. W. 209; *Alfred E. Ely* v. *Monroe Stannard*, 44 Conn. 528; 18 C. J. 155, Sec. 29.

In this State the principle of this rule is statutory. The term "conveyance" is made to embrace every instrument in writing by which any real estate or interest in real estate is created, aliened, encumbered, or assigned. R. S. Utah 1933, Sec. 78-1-1. And a fee simple estate is presumed to be intended to pass by every conveyance of real estate unless it appears from the conveyance that a lesser estate was intended. R. S. 1933, Sec. 78-1-3. The term "heirs" is not requisite to a transfer of the fee simple title in real estate. R. S. 1933, Sec. 78-1-2. But the deed, Exhibit 13, here in question, does contain words of succession to the grantee's "heirs and assigns forever."

It is contended by respondents that the deed, Exhibit 13, is not a statutory quit-claim deed. This is, we assume, because the words "remise" and "release" are employed in addition to "quitclaim" in the conveying clause, the latter

word alone being within the statutory formula. R. S.
1933, Sec. 78-1-12. The tenendum clause in the deed
is also nonstatutory in form. However, Sec. 78-1-12
does not prohibit other forms of deed, or other words cou-
pled with the statutory form. The statutory form is per-
missive and when used has the assigned effect. Simplicity
and economy was the aim, but parties may still contract
and convey in such terms as they care to employ. We con-
strue the word "quitclaim" as used in the deed to have the
same meaning as if used alone without the words "remise"
and "release" which precede it. The latter do not neutralize
the former. The cases we have cited show that the three
words together have but one meaning and are effective as
words of conveyance. The deed, Exhibit 13, was effective
to pass title to whatever interest the grantors had at the
time, be it a one-fourth interest or less, to their grantee.
This view is not weakened but strengthened by the tenendum
clause which makes the grant to the grantee and her heirs
and assigns forever.

In support of the opposite theory, plaintiffs have recourse
to certain tax proceedings before and after the deed (1902).
To this we observe, first, that the prior tax sale of 1898 was
void and of no effect on the title. Hence, the imputed as-
signment to Ruthrauff of the certificate of purchase at
tax sale on July 1, 1898, was of no effect. Even if valid,
it would have conveyed no interest but only the right to a
deed ultimately unless redeemed. An assignment by Ruth-
rauff to Rose Brown of an interest in the certificate would
have met every useful purpose.

As to the subsequent tax proceedings, the evidence pur-
ports to show that during several years after the deed of
1902 (Exhibit 13), a one-fourth interest in the Augusta
Lode Mining Claim was assessed to Rose Brown, and a like
one-fourth interest to Ruthrauff. They further show
that from 1909 to 1916, inclusive, it was assessed to
Ruthrauff, Brown, Kennedy, and Hurlburt, as co-
owners. We think this evidence was incompetent and in-

effective to vary the legal effect of the deed, Exhibit 13, as denoted by its face. The latter is clear and plain and the deed was fully effective. If it needed elucidation, the later tax proceedings throw no light on the intention of the parties at the time it was executed in 1902. *Adams* v. *Hickox, Sheriff,* 55 Iowa 632, 8 N. W. 485; *Puckett* v. *Richardson Drug Co.,* 1 Tex. Civ. App. 634, 20 S. W. 1127; *Tuckwood* v. *Hanthorn,* 67 Wis. 326, 30 N. W. 705.

It is urged that these tax records tend to show a recognition of Ruthrauff's continued interest after the date of the deed to Rose Brown in 1902. We cannot agree. It is not shown that the tax records were made or based upon any statement or declaration by Ruthrauff himself, or of his heirs; nor, for that matter, who paid the share of the taxes on the supposed Ruthrauff interest. The latter died in 1912 or 1913 and could have made no declaration thereafter. The tax was insignificant in amount—only about $2.00 or $2.50 on the entire claim—and Ruthrauff's share would not have exceeded thirty to fifty cents. His imputed share may well have been paid by one of the other owners, since it would cost less to do so than to bother writing him for it, or to enforce contribution, assuming that he had an interest. In some years the tax was paid; in others, not.

Should we assume without proof that Ruthrauff himself paid a share of the annual tax on the claim prior to his death, it would not affect or impair his prior deed in 1902 as a conveyance. It would be at most an implied declaration that he still had or claimed an interest in the property. But an implied declaration to this effect by Ruthrauff is of no more value than his express declaration would be in his own favor or that of his heirs. An express declaration of a claim by a grantor in a deed, self-serving and in disparagement of his own solemn deed, is a nullity. It is not evidence in his own favor or of those claiming under him. The principle of this rule is well stated in 22 C. J., at pages 234-236, title "Evidence," Secs. 213, 215, 217-219; *Smith* v. *Hanson,* 34 Utah 171, 96 P. 1087, 18

L. R. A., N. S., 520; *Diaz* v. *Industrial Comm.*, 80 Utah 77, 13 P. 2d 307; *Baird* v. *Baird,* 193 Cal. 225, 223 P. 974.

The deed (Exhibit 13) expresses the consideration of one dollar, but this feature has little relevance in determining the intention of the parties. It is a common practice to state a nominal instead of the real consideration. The majority of the deeds in the chain of title to this mine express but a nominal consideration. No point is made by plaintiffs on this ground, however.

Finally, if the Ruthrauff deed, Exhibit 13, does not as contended speak the true meaning and intent of the parties, it is late for the question to arise. There are remedies in equity for such a situation by way of reformation of the deed. But the remedy must be sought within a reasonable time after discovery of the facts constituting grounds for reformation. This deed was executed in 1902, more than 35 years ago. So far as appears, Mr. Ruthrauff, the grantor, never claimed there was fraud, accident or mistake in the deed during the more than ten years he lived thereafter. His heirs, in all the 26 years since his death in 1912 until this suit, never questioned it. It is too late. Equity favors only the diligent. All, or nearly all, who might have known the facts and testified thereto are now silenced in death. No one was produced as a witness to testify so as to throw any light on intent at the time, aside from the deed itself. It is very questionable whether plaintiffs' complaint is sufficient to present an issue of this nature for trial. The complaint merely alleges facts on which to quiet title. Plaintiffs may quiet their title only if they have one. On the record they have no title. Title passed from their ancestor by his deed more than a generation ago. No issue is tendered on which to impress an equitable interest upon the legal title now held by another. The attempt to read into the later tax records a controlling effect over a prior express deed of their ancestor cannot prevail. The stability of titles and the respect due to solemn deeds of parties executed in a departed generation of men,

and long acquiesced in, forbid the attempt to question the deed of 1902 at this late day. It is sufficient to say, giving to the deed in question its due legal effect, that title to the interest formerly held and owned by Charles C. Ruthrauff (to the extent of 375 feet or less) passed thereby to Rose Brown, and from her by subsequent deed to the defendant Silver King.

Likewise is it true that the interests of all the other owners of the Augusta mine have, by the documentary evidence, passed to and become vested in the Silver King, unless the claims of the defendants Anderson, et al., by succession to the interests formerly owned by Samuel Edgerly and Edward Covington can be sustained. To this question, we now turn our attention. As we have pointed out, the original one-quarter interest of each under the location certificate had been reduced by conveyances, so that at the date of the patent they had record claim to only 94 feet 3 inches each. The patent cast the entire legal and record title upon the five patentees named therein. What was the nature of the estate, right, title or interest of those claiming record interests by conveyances prior to patent, in or to the patented land?

Those claiming by conveyances from or under the original locators succeed to only such rights as the locators themselves possessed under the certificate of location and under the mining laws, rules and regulations governing the disposition of the public mineral lands of the United States. Location rights are mere possessory rights, dependent for continuance upon due compliance with the laws under which mining locations are made, and under which the ultimate legal title may be acquired. The paramount legal title remains in the government until full compliance with the statutory conditions upon which the right to final purchase and patent depends. These conditions are that the locator shall show some degree of diligence in developing a mine, to the extent of at least $100 per year in improvements. In case of default the ground may be located

by another with consequent transfer of the right of possession. If the requisite development work is performed the right of exclusive possession continues until at least $500 has been expended in labor or other substantial improvements, whereupon the locator (or his grantee in possession) becomes entitled to a patent upon payment of $5.00 per acre for the surface area embraced in the location. Thus, labor and improvements to the amount of at least $500, plus $5.00 per acre for the area embraced in a mining claim, constitute the statutory purchase price in consideration of which the government agrees in advance to pass the legal title by patent, when fully paid and performed. Until fully paid, the locator has only an inchoate equity and the right of possession, defeasible by a failure to do annual labor or otherwise perfect his right to a patent. It is a property right nevertheless, though imperfect, and may pass by deed, be taken on execution for debt and pass to heirs by inheritance or succession.

Where a mining location is held by several, the obligation rests upon each and all to perform the conditions of their tenure, which is in the nature of a tenancy in common. Upon each and all rest the duty and burden of annual labor, development work, and ultimate patenting expense, if they proceed so far. In case of failure of one or more of the locators or owners to pay or perform or to contribute his share of the burdens of ownership, he may be defaulted out by advertised notice or in a suit for contribution of his share by those who have paid or performed for the whole claim.

On the other hand, no locator or owner is obliged to hold his claim or interest longer than he desires. If the outlook seems to him doubtful he may abandon the claim or surrender it to his associates who choose to go forward. Or they may all quit and restore the ground to the public domain. If one of two or more co-owners elects to prosecute work and hold on he may eliminate his associate by "advertising him out." Or he may make the outlays

and charge his associate's interest with a lien enforcible by suit for contribution or for foreclosure of the lien. If he goes to final patent at his own cost, the defaulting associate may renew his interest by tendering contribution within a reasonable time and demanding a deed. The patentee in such case takes title by the patent in trust for his co-owner under the prior location. If the latter delay too long to "do equity," he cannot forever claim a lingering equity in the patented title acquired by the efforts and outlays of another. It must be borne in mind that rights under a mining location are mere shadow rights, rights of possession, devoid of title, dependent upon continued outlays in money or labor until the paramount title of the government is earned upon the statutory terms. If the locator slackens his efforts his rights will vanish upon entry and location by another. He cannot ride through upon the efforts and sacrifices of another or others. If the latter earn the title, it is theirs, not his.

It is just here that many locators or co-owners of a mining location falter, ponder long, and finally quit rather than incur further expense. Or financial weakness may compel withdrawal. Or he may negotiate terms by which his associates agree to carry on for their mutual benefit at their expense upon the security of his share interest in the mining claim or upon other security for their reimbursement. Or he may bargain with them to patent the claim in their names in trust for a corporation to be formed after patent, to which the title shall be conveyed and stock distributed to each according to his actual interest. In all such cases, the patentees obtain the legal title from the government as trustees of an express trust created by the contract of the owners of the location rights who have contributed, or secured their contributions, to the cost of perfecting title to the common property. Such a trust is in its nature a continuing one and it does not terminate until the contract is breached; that is, repudiated by the patentees (become trustees). One method of repudiation is by publicly or notoriously setting up a claim inconsistent with the

existence of the trust. Specifically, the trust is repudiated by the patentees executing a conveyance to a third person of an interest greater than their own actual interests which can only be made good by passing the equitable share interest of those who have contributed but are not named as patentees.

"The act of [a cotenant] in making a deed, whereby he in terms conveyed title to the whole premises in question, was an unequivocal act, by virtue of which he clearly indicated to every one including his cotenant, that he claimed the title to the whole of the premises in question. Such an act was * * * notice to all the world that the grantor claimed title to the whole property, and thus excluded all others." *McCready* v. *Fredericksen*, 41 Utah 388, 126 P. 316, 320.

This point is important as bearing upon the claims of the defendants Anderson, et al., as we shall see later because on the theory most favorable to them the trust created by the patent to their co-owners may have been an express trust rather than an implied one arising from some misconduct of the patentees in excluding their names from the patent proceeding. And in some cases of express trusts it has been held that the trustee must not only repudiate but bring notice thereof home to the cestuis que trust of the fact of such repudiation before the latter is put upon his diligence to seek a remedy, and hence before either limitations or laches begin to run against him. The rule in this respect is by no means uniform, however, Much depends upon the circumstances of each case and hence the cases vary in prescribing the degree of diligence imposed upon one who unduly delays to act.

The foregoing in outline stands for one type of trusts frequently arising in mining cases. There are many others but we shall only notice two or three of them. One is shown in type by the case of one or more of several locators or co-owners who without exacting contribution from co-owners proceed to patent on the claim at their own cost and expense, and without any specific agreement with the noncontributing owners for reimbursement of their share of the outlays. A trust then arises in equity of a dif-

ferent sort,—a resulting trust,—in favor of the excluded co-owner subject, however, to the burden and necessity upon the latter to "do equity" by tendering contribution of his share of the outlays. Such a case arises also where one or more of the owners incur a debt against the mining claim for development purposes, on which the claim is sold and bought in by themselves at execution sale. Or where they let the common property go to tax sale and buy it in. But in any such case the excluded co-owner cannot delay to assert his rights on the theory that the trust is a continuing one, as in the case of an express trust. For there is a palpable, or at least an apparent, attempt to exclude him from the common estate and he is thereby put upon notice. He must act promptly. He cannot wait to see whether as the result of the labors, investments and courage of others, the mining claim will finally prove to be valuable. He must act while he can still recover precisely what he is about to lose, viz.: The claim in its present undeveloped condition. He is put upon his election forthwith whether he will share the perils, sacrifices, and possible losses or benefits as the event may show; or he can step aside and let his associates go forward at their own risk and without cost or liability to him. If he neglects to act or fails to tender his dues, or bring suit if need be to back up his demand, then limitations and laches begin at once to run against him from the time of his exclusion from the patent or other adverse step taken by his co-owners. He has due record notice of what has been done and cannot profess ignorance. As we further said in the McCready Case, supra:

"It is a well-established principle that a tenant in common cannot acquire title adverse to his cotenants by purchase at tax sale. He will be regarded as holding the title he thus acquires in trust for his cotenants, *until the presumption is rebutted by their refusal to contribute in payment of his outlays.*" 41 Utah 388, 126 P. 316, 319.

There is yet another type of cases often presented to the courts where there are two or more owners of a mining claim. Active development work is in charge of one of the

owners, the others being absentees engaged in their own separate businesses, contributing to the cost of development. The active owner discovers a rich body of ore but conceals it from his co-owners and others. He perhaps professes great discouragement at the outlook and an inclination to give up. Sometimes by false statements he induces them to relinquish, abandon, or sell to himself at a small cost. Or he may relocate in the name of himself or another. Later he turns up as the owner of a bonanza or as prime mover in a dummy corporation organized to acquire and control it. The methods are as varied as a fertile and cunning brain can make them, but the result is the same—a swindle. In such cases, the knave or his tool, the corporation, may be held as trustee for the defrauded co-owners. It is called a constructive trust; that is, a trust devised in equity, not by contract of the parties. In all such cases diligence is required on the part of the victim to discover and repair the wrong done him. He cannot wait for repudiation of the trust as in cases of express trusts. The fraud and wrong done him is in itself a repudiation. Nor can he wait for many years to see whether the mine will ultimately prove valuable by the labors and investments of others. He also must act while equity can give back to him just what he parted with in its then condition and subject to the equitable burdens up to that time. He cannot in turn perpetrate a fraud upon others by waiting to see if the mine will prosper as a result of their contributions, not his. Limitations and laches begin to run from the time he knew or by reasonable inquiry might have known the relevant facts. He is charged with constructive notice by the public records and by facts of local public notoriety and often by newspaper reports concerning the title and development work on the mine, such as would interest anyone with a financial stake in it. Least of all can one or more excluded co-owners wait for thirty, forty or fifty years until all of the original actors have died, evidence vanished, memories failed, and then call upon equity to reinstate them in their or their an-

cestors' former interest in the property. In such cases equity is unable to assist them.

What are the facts at bar and when did limitations or laches begin to run against defendants Anderson, et al., if at all? It appears by the record that the approximately one-eighth interest they seek to recover was formerly owned (on the records) by their ancestors Samuel Edgerly and Edward Covington, long since deceased. Edgerly died August 6th, 1889; Covington, in 1919. The mining records indicate that at and prior to the date of the patent in 1882 they retained out of their original one-quarter interests each a mere 94 feet 3 inches interest, or about a 1/16 interest each, There is no evidence of any substantial amount of development work having been done prior to the patent beyond the minimum $500 required to obtain a patent. There is no evidence as to how or by whom this was paid or contributed. An affidavit of labor recorded January 8, 1881, showed that the annual labor on the claim for 1880 was performed by Samuel Edgerly and Peter Connor "for the benefit of the owners of the claim." Connor was not the owner of any interest. They were both doubtless paid for their work by the associates and we may concede prima facie that Edgerly's own interest was protected thereby for that year. There is no affidavit of labor for 1881. The application for patent was filed July 12, 1881, and final proof and payment was made on November 22, 1881. The claim having been located on November 5, 1879, (too late for substantial work in that year), and annual labor being counted on to hold the claim for 1880, the real development work to earn the right to a patent must have been done in 1881, prior to the patent application on July 12th of that year, or else in 1880 after the annual labor. Who paid for this additional work is not shown. Whether Edgerly or Covington contributed thereto or to the legal and engineering expense of patenting, or to the $105.00 cash purchase price is not shown by the record. Whether their co-owners, the pat-

entees, carried the expense under some express agreement for their benefit is not shown by this record. Whether the patentees may have asked for their contributions and were refused or whether they bought and paid for the Edgerly and Covington interests outright is not shown. We can only surmise and guess at the real facts of the case. If Edgerly and Covington were unjustly excluded from the patent by their former associates, the patentees, they were strangely silent for many years thereafter and remiss in failing to seek a remedy for the wrong and injury done them. Edgerly lived seven years and Covington 37 years thereafter without once indicating that they considered themselves wronged by their exclusion from the patent. Their descendants have remained silent for many years. more. They do not now know, nor profess to know, what, if any, wrong was done to their ancestors at the time of the patent in 1881-1882, fifty years or more back. If the property has lately become valuable, as the consideration mentioned in some of the recent deeds may indicate, that would furnish them an incentive, if not a good cause of action, to try and establish an interest in the property. They do not in their pleading profess a knowledge, or tender an issue, as to what sort of a trust, if any, arose in respect of the patent in 1882 in favor of their ancestors Edgerly and Covington—whether it was an express trust, a resulting trust, or a constructive one, or any at all. Without any issue in this respect, we are asked to imagine some sort of a trust, surviving to this time in favor of their heirs. We may with greater reason conclude that they have no interest at all, that no trust ever arose either by contract or by operation of law, and that all the rights they ever had were abandoned, relinquished, or sold and transferred for a consideration to the patentees before they went to patent.

Even had defendants Anderson et al., been able to both allege and prove a prima facie good cause of action in favor of their ancestors as far back as 1882, a court of equity

would be loth to assist them at this late day. The rule in such cases has often been declared by this and other courts in the following words quoted directly from United States Supreme Court decisions, viz.:

"A court of equity * * * has always refused to aid stale demands, where the party has slept upon his rights and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced. * * * It was not important to determine whether [the defendant] was the trustee of a mere dry legal estate, or whether his duties and responsibilities extended further." *Speidel* v. *Henrici*, 120 U. S. 377, 387, 7 S. Ct. 610, 612, 30 L. Ed. 718.

"The rule is that the cestui que trust should set forth in the bill specifically what were the impediments to an earlier prosecution of the claim, and how he or she came to be so long ignorant of their alleged rights, and the means used * * * to keep him or her in ignorance, and how he or she first came to the knowledge of their rights." *Godden* v. *Kimmell*, 99 U. S. 201, 211, 25 L. Ed. 431.

It is immaterial whether the transaction assailed is void or voidable. If the complainant has been guilty of laches, a court of equity will not look into the transaction at all. It requires conscience, good faith and reasonable diligence. These wanting the court will remain passive and leave the parties where it finds them. *Board of Com'rs of Leavenworth County* v. *Chicago, R. I. & P. Ry. Co.*, C. C., 18 F. 209; *Sullivan* v. *Portland & K. R. Co.*, 94 U. S. 806, 24 L. Ed. 324.

"For 15 or 18 years the appellant sat idly by. Meanwhile some of the persons acquainted with the facts have died, and the great lapse of time has dimmed the memory of others. After 15 years of inaction he calls upon us. Such a voice does not stir the conscience of a court of chancery. Ordinarily, equity puts out its assisting arm only to those who have shown a disposition to help themselves. * * * A defrauded party must be diligent in making inquiry. The means of knowledge are equivalent to knowledge." *Teeter* v. *Brown*, 130 Wash. 506, 228 P. 291, 292.

For other cases in point, see *Patterson* v. *Hewitt*, 195 U. S. 309, 25 S. Ct. 35, 49 L. Ed. 214; *Philippi* v. *Philippe*,

115 U. S. 151, 5 S. Ct. 1181, 29 L. Ed. 336; *Felix* v. *Patrick,* 145 U. S. 317, 12 S. Ct. 862, 36 L. Ed. 719; *Neagle* v. *McMullen,* 334 Ill. 168, 165 N. E. 605, syl. 12; *Cassidy* v. *Silver King Coalition Mines Co.,* 8 Cir., 199 F. 100; *Hynes* v. *Silver Prince Min. Co.,* 86 Mont. 10, 281 P. 548; *Scott* v. *Crouch,* 24 Utah 377, 67 P. 1068; 10 R. C. L. 395, Sec. 142.

It does not appear from the record that the property was regarded as of substantial value until within two or three years before the commencement of this action. The tax records indicate its assessment for taxation on a nominal valuation for many years after the patent. It has never been worked or developed until recently. The original owners and patentees became scattered in distant places. They were often negligent about the taxes though insignificant in amount. For many years there were no transfers of interests, presumably for lack of demand therefor, as might be expected if the mine was known or believed to be valuable. Only as late as 1929 did the Silver King acquire an interest for a recited valuable consideration, followed by others in 1931. The awakened interest thus stimulated may have something to do with the claims and counterclaims in this action, other than those of the Silver King.

In this class of cases more than ordinary diligence is exacted in seeking to enforce hidden equities and bringing them to the light of day. A mine of little value today may by developments or a sudden discovery of rich ore be of great, even fabulous, values tomorrow or next year. The concealed claimant may not then suddenly spring from his ambuscade of silence, and exact a division. *Patterson* v. *Hewitt,* supra; *Cassidy* v. *Silver King C. M. Co.,* supra; *Teeter* v. *Brown,* supra.

The claims of both plaintiffs and defendants Anderson et al., have become hoary and frosted with age, stifled and smothered by neglect and inattention, obscured by the depredations of time, objectionable in their antiquity. The essentials of a good cause of action may never have existed at all. Deaths, removals, and effacement of evidence during

many, many years have paralyzed the arm of equity and it is powerless to assist them. If any equities ever existed in favor of Edgerly or Covington, they were represented in the legal title cast upon the patentees by the patent. These or some of them at an early day executed conveyances to third persons of interests in amounts that could only be satisfied and made good by passing the share interests that would be represented by the supposed equities of Edgerly and Covington. These have been conveyed and reconveyed, distributed as assets of deceased persons' estates by decrees of court, and finally have become conveyed to and vested in the defendant Silver King. If these were to be reinvestigated not all the necessary parties are before the court in this action. We must hold the claims of the several parties to this action, other than the Silver King, barred by laches and their several claims and counterclaims should be dismissed.

The judgment of the District Court is reversed and the cause remanded with instructions to dismiss the plaintiffs' complaint and the counterclaim of defendants Anderson et al., to set aside its findings of fact, and make new findings and a decree in favor of the defendant Silver King, quieting its title to the entire Augusta Lode Mining Claim, U. S. Lot No. 122, against both the plaintiffs and defendants Anderson et al. The appellant Silver King is entitled to judgment against the plaintiffs for all its costs on appeal, except the expense of printing twenty-one printed pages of its brief in reply to the brief on cross-appeal of defendants Anderson et al. For the cost of printing said twenty-one pages of brief the Silver King is entitled to judgment against the said cross-appellants.

FOLLAND, C. J., and MOFFAT, LARSON, and WOLFE, JJ., concur.