Catherine PECK, and the Utah Democratic Committee, Michael Miller, Chairman, Plaintiffs and Respondents,

v.

David S. MONSON, Secretary of State/Lieutenant Governor of the State of Utah, Defendant and Appellant.

No. 18646.

Supreme Court of Utah.

Aug. 23, 1982.

David L. Wilkinson, Atty. Gen., Sharon Peacock, Asst. Atty. Gen., Salt Lake City, for defendant and appellant.

Gary E. Atkin, Salt Lake City, for plaintiffs and respondents.

HALL, Chief Justice:

The petition in this matter was filed pursuant to the provisions of U.C.A., 1953, 20–1–11 to resolve a controversy that has arisen regarding the candidacy of Catherine Peck (Peck) for the Democratic nomination for Representative to the Utah State House of Representatives, District 69.

David S. Monson, Secretary of State/Lieutenant Governor of the State of Utah (Monson), appeals from the order of the district court which directed him to accept the candidacy of Peck, and which directed the appropriate county clerks to place the name of Peck on the primary election ballot.

The facts of this case, as found by the trial judge, are not in dispute. On April 26, 1982, one Janet Prazen filed her declaration of candidacy for the Democratic nomination for the Utah House of Representatives,

State Legislative District No. 69, believing that she was a resident of that district and that she was fully qualified as a candidate for said office. The fact that Prazen was not a resident of District 69, but resided across the street in District 70, was not discovered until after the filing deadline had passed. Thereupon, the Utah State Democratic Central Committee submitted their certification of Peck, pursuant to U.C.A., 1953, 20–4–11, to fill the vacancy occasioned by Prazen's disqualification for lack of residency within the district. Peck does reside in District 69 and is otherwise qualified, but Monson has declined to accept her as a replacement candidate.

It is further undisputed, and the trial judge so found, that all parties to this proceeding have acted in a good faith belief that their actions were legal and proper.

The trial judge accepted jurisdiction and viewed the facts of this case in the light of U.C.A., 1953, 20–4–11, *supra*. He concluded that Prazen was disqualified as a candidate within the meaning thereof, and that Monson was therefore required to accept Peck as a duly certified replacement candidate. The said statute reads as follows:

> ~~When there are~~ If no more than two candidates have filed for a nomination and one or both ~~shall die, resign~~ dies, resigns because of becoming physically or mentally disabled as certified by a physician or ~~become~~ is disqualified ~~,~~ after the close of the filing period ~~, and~~ but before the primary election or if after the primary convention and before the general election ~~,~~ a candidate ~~shall die, resign~~ dies, resigns because of becoming physically or mentally disabled as certified by a physician or ~~become~~ is disqualified, the proper state or county central committee, as the case may be, of that party shall certify the name of another candidate or candidates ~~, if available,~~ to the proper filing election officers.[1]

Monson's sole contention on this appeal is that the trial judge erred in interpreting the foregoing statute as having application to a disqualification that existed at the time

1. As amended, 1981.

of filing for office, and which persisted after the filing deadline had passed. He asserts that the disqualification contemplated by the statute is one that arises after the filing deadline, and since Prazen's lack of residency disqualified her as a candidate at the time she filed for office, the statute affords no basis upon which a replacement candidate may be certified. For several reasons, we do not agree.

It is first to be observed that the statute in question does not contain language that expressly limits the disqualification of a candidate to an occurrence which comes after the filing deadline has passed. On the other hand, the fact that the present tense verb "is" precedes the term "disqualified" each time it appears in the statute fully supports the contrary conclusion of the trial judge that the statute contemplates a disqualification whether it existed prior to the filing deadline or not. This is to be seen in that the phrase "is disqualified" simply connotes the ascertainment of a state of being. In the absence of any limiting language in the statute, it matters not whether the state of being disqualified arose *before* or *after* the deadline for filing.

It is also to be observed that in each instance where the phrase "is disqualified" appears in the statute, it is preceded by the disjunctive "or" following the phrase, "dies, resigns because of becoming physically or mentally disabled as certified by a physician." The latter phrase clearly contemplates a disqualification that occurs after the filing deadline. However, when contrasted with the general phrase which follows, "or is disqualified," an alternative basis for disqualification is provided for. The legislative intent thus emerges to encompass within the statute any and all disqualifications, irrespective of the time of their occurrence. Particularly is this so in light of the 1981 amendment which substituted "is" for "shall ... become" preceding the word "disqualified." That language change negatives the concept of a legislative intent to limit the disqualification of a candidate to an occurrence after the filing deadline.

Monson advances the contention that should the ruling of the district court be left to stand, it would invite abuse by those seeking to manipulate the electoral process. We view the contention to be without merit, particularly in light of the provisions of U.C.A., 1953, 20–4–9 which require those filing as candidates for public office to swear or affirm under the penalties of perjury as to their place of residence, qualifications for office, willingness to accept nomination and not withdraw, and that they will not violate the election laws. We deem those statutory provisions as adequate safeguards against any potential for abuse of the statute that may exist.

Affirmed. No costs awarded.

STEWART, HOWE and DURHAM, JJ., concur.

OAKS, Justice (concurring):

In addition to concurring in the Court's opinion, I deem it desirable to elaborate a threshold consideration not treated there.

Appellant urged the district court to dismiss this suit because it was not timely. All of the pertinent facts in the controversy were known within a few days after the April 26th filing deadline. The party central committee's nomination of Peck (May 22nd) was certified to the appellant by letter dated May 24th. His refusal to place her on the ballot, communicated by letter dated May 26th, defined the issue in this case and provided the final fact necessary to its resolution. But plaintiffs did not file this suit challenging appellant's action until July 20th, 55 days later and only 35 days before the responsible official had to have final text for the primary election ballots in order to accomplish their printing and distribution in advance of the statutory deadline.

In another context, we have recently identified the filing of a Declaration of Candidacy as "the most important step mandated by the legislature to become a candidate," characterizing it as "an important requirement which the legislature saw fit to impose to protect the election process ...." *Utah State Democratic Committee v. Monson*, 652 P.2d 890 (1982). An essential ingredient of that protection is for the

candidates to have ample time to present themselves and contest their opposition, and for the public to evaluate the alternatives. For that purpose, the legislature has directed that Declarations of Candidacy must be filed not later than April 25th (26th where the 25th falls on a Sunday), almost five months prior to the primary election.

In this case, plaintiffs did not even file suit until three of those five months (and their own state convention) had passed, even though they were aware of all of the essential facts in the controversy during almost all of that time. When suit was finally filed, plaintiffs necessarily called upon the courts to resolve the controversy by urgent scheduling so that the ballots could be printed in time for the primary election the second Tuesday of September. When this opinion is issued, the district court and the Supreme Court will have managed to resolve the dispute in approximately one month, but only three weeks will remain for an election process for which the legislature prescribed five months. In the meantime, the other candidate has been unsure of his opposition, and voters have been unsure of the alternatives. That sequence of events is contrary to the public interest in the integrity of the election process.

Plaintiffs seek equitable relief. Under the special rules applicable in equity, the district court had discretion to decline to exercise its jurisdiction in this case. 27 Am.Jur.2d *Equity* § 102 (1966). Under those rules, a court of equity may refuse to protect a private right if its exercise of jurisdiction would be prejudicial to the public interest. *Id.* at § 104. A court of equity will also refuse to aid a party who has failed to exercise reasonable diligence in asserting his rights; equity only aids the vigilant, and will deny relief to a litigant who has slept on his rights. *Id.* at § 130; *Ruthrauff v. Silver King Western Mining & Milling Co.,* 95 Utah 279, 300, 80 P.2d 338 (1938). The application of these principles is especially appropriate in election contests, since the extraordinary jurisdiction of equity ordinarily is not exercised to enforce a person's right to be a candidate for public

office. 26 Am.Jur.2d *Elections* § 369 (1966); *Annot.,* 1 A.L.R.2d 588 (1948); 70 A.L.R. 733 (1931); 33 A.L.R. 1376 (1924).

This Court applied these equitable principles in denying the requested relief in *Clegg v. Bennion,* 122 Utah 188, 247 P.2d 614 (1952), where a candidate waited 32 days after the filing deadline to charge that the opposition candidate had filed one day late (in honest reliance upon mistaken advice from the Secretary of State's office). In the meantime, the state convention had been held and the candidates nominated there had begun their campaigns. When the challenge was finally made, by original petition in this Court, it was mid-August, and the primary election deadline was imminent. In explaining its denial of the requested relief of deleting the late-filer's name and substituting the petitioner's on the primary ballot, this Court stated:

> [W]e feel that [petitioner] comes to us too late. *Matters of import as great as this require airing at the earliest opportunity* and at a time when anticipated error may be prevented of occurrence. In this case any question of ineligibility or disqualification existed, if at all, on July 12, 19 days before the convention to which the declarants' names were to be presented. During that period the matter could have been litigated. Seeking relief 13 days after the convention had met, accepted and nominated [two of] the declarants, *impresses us as not being within that reasonable time contemplated in equity in such cases.* It would seem rather to provoke an unfair assurance that third place losing candidates have two shafts to their bow, while disfranchising delegates to party conventions which traditionally have enjoyed an autonomy usually unreviewable by the courts. [Emphasis added.]

122 Utah at 192–93, 247 P.2d 614.

The overriding importance of the public's interest in the integrity of the election process and the breadth of a court of equity's discretion in such cases is underlined by the United States Supreme Court's decision in *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5,

21 L.Ed.2d 24 (1968). Although holding that the state election laws in that case deprived a new political party of rights guaranteed in the United States Constitution, the Court held that the state was not required to place the party on the ballot for a particular election because the party's conduct of the litigation had brought the matter to the appellate court in such a form and at such a time that the requested relief would cause a "serious disruption of election process," including risk of interference with the rights of absentee and other voters. 393 U.S. at 35, 89 S.Ct. at 12.

The public interest in the integrity of the election process and in adequate time for judicial resolution of legal questions attendant thereto would be sufficient to justify withholding equitable relief from a plaintiff who has failed to act with "reasonable diligence," 27 Am.Jur.2d *Equity* § 130, to put the controversy before the courts "at the earliest opportunity." *Clegg v. Bennion*, 122 Utah at 192, 247 P.2d 614.

Under the foregoing principles, the district court could have used its discretion to decline to exercise equitable jurisdiction on the facts of this case. But the court decided otherwise, and in fact found that the suit was "properly brought." The appellant has chosen not to dispute that decision on this appeal, and I am also unable to conclude that the court's decision was an abuse of discretion on the facts of this case. I therefore join the Court in reaching the merits of this appeal.

HOWE, J., also concurs in the concurring opinion of OAKS, J.