**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 10, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

GENERAL CHARLES E. "CHUCK"
YEAGER, (Retired), an individual,

        Plaintiff - Appellant,

and

PMN II, a Delaware limited liability
company,

        Plaintiff,

v.

FORT KNOX SECURITY PRODUCTS,
a Utah corporation,

        Defendant - Appellee.

No. 14-4011
(D.C. No. 2:11-CV-00091-TS)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **McKAY**, and **McHUGH**, Circuit Judges.

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

General Charles E. Yeager brought this action against Fort Knox Security Products ("Fort Knox") asserting various claims under Utah law as well as the Lanham Act to redress the alleged misuse of his name and likeness in connection with the sale of Fort Knox products. The district court granted summary judgment for Fort Knox based on the doctrine of laches, and General Yeager has appealed. On de novo review, *see Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 948 (10th Cir. 2002), we affirm in part, reverse in part, and remand for the reasons stated below.

## I. BASIC FACTUAL AND PROCEDURAL BACKGROUND

Fort Knox manufactures and sells gun safes and other security products. In the mid-1980s, General Yeager and Thomas James, who founded Fort Knox, met at a Safari Club International ("SCI") Convention and entered into an oral agreement allowing the use of General Yeager's name and likeness to promote Fort Knox products in return for free safes for General Yeager and members of his family. The substance of that agreement is now disputed in certain respects, but the parties agree that it could be terminated by General Yeager at any time.

Fort Knox began producing advertising materials on the basis of the agreement. It even called a product line the "Yeager safes," an arrangement it asserts General Yeager also agreed to orally. In the later 1980s, Fort Knox also started purchasing copies of a book written by General Yeager, for him to sign and return to Fort Knox for use in promoting its safes. In 1989, General Yeager toured the Fort Knox facility, staying at the home of Mr. James. For many years, General Yeager

did not voice any concerns over how Fort Knox was effectuating their oral agreement.

In 2008 or early 2009, however, General Yeager's current wife, Victoria Yeager, who manages his proprietary rights and commercial endorsements, began inquiring about the agreement between Fort Knox and her husband. Fort Knox asserts that these inquiries led it to be concerned about the potential for difficulties arising over the continuing use of General Yeager's name and likeness, which it ceased with one exception. That exception was the display of a poster of General Yeager at a SCI Convention in January 2009, attended by General Yeager. This action was commenced two years later.

General Yeager's claims are rooted in two basic allegations: (1) Fort Knox exceeded the terms of the oral agreement, which limited use of his name and likeness to the annual SCI convention, thereby unjustly enriching Fort Knox and depreciating the value of his proprietary rights; and (2) Fort Knox continued to use his name and likeness despite outright termination of the agreement sometime in 2008. Fort Knox moved for summary judgment on the bases of the statute of limitations and laches. The district court chose not to rely on the limitations defense but did agree with Fort Knox that the action was barred by laches.

## II. DISTRICT COURT ORDER

The district court identified and analyzed the two basic elements of laches under Utah law: the plaintiff's lack of diligence and prejudice to the defendant from

the resultant delay.[1]  *See Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 289 P.3d 502, 510 (Utah 2012).  General Yeager emphasizes the losses he claims to have suffered as a result of Fort Knox's alleged invasion of his legal rights, but as the district court explained, consideration of harm to the dilatory plaintiff—in particular harm based on the asserted merit of his belated claims—"is not merely unnecessary; it is forbidden."  *Id.*; *see also id.* at 512 (explaining that a different rule, "one where a court's recognition of meritorious claims could defeat a laches defense[,] would be antithetical to the whole point of the doctrine of laches").

As to diligence, the district court held that General Yeager should have known from the promotional arrangement regarding the use of his autographed books, which began in 1987, that Fort Knox's implementation of their oral agreement had clearly gone beyond the limited rights to which he now alleges the agreement was restricted. While Fort Knox points to additional incidents that it insists would have contributed to putting General Yeager on notice of its broader understanding and implementation of the agreement, the district court focused on the book-signing arrangement, noting that "once Yeager began autographing a large number of books for Defendant, it

---

[1]     The parties have not challenged the district court's application of Utah law to this case, nor have they indicated that federal law (for the Lanham Act claim) would be different in any material respect.  Indeed, the same elements of diligence and prejudice drive the laches inquiry under federal law.  *See F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1491 (10th Cir. 1994).  Under the circumstances, we likewise apply Utah law. *See, e.g.*, *Mullin v. Travelers Indem. Co. of Conn.*, 541 F.3d 1219, 1222 (10th Cir. 2008); *MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc.*, 962 F.2d 1470, 1475 n.7 (10th Cir. 1992).

would have become clear to Yeager that his relationship with Defendant had moved beyond Plaintiffs' claimed understanding of the original agreement." R. Vol. 8 at 337. The court went on to elaborate:

> Even if the Court accepts Plaintiffs' position that Yeager's relationship with Defendant was originally confined to Defendant's advertising at the SCI Convention, that relationship had fundamentally changed once Yeager signed a significant number of books for Defendant to use as a way of boosting sales. Yeager began signing books for Defendant twenty-four years before the Complaint was filed in this case. Morever, even if Yeager was [subjectively] unaware of his rights until [as he claims] September 2007, he exercised no diligence to inquire with Defendant once he was on notice that Defendant was operating under a belief that the parties' relationship was more expansive than Plaintiffs assert in this suit. At that point in the parties' relationship, Yeager was in frequent contact [with] Defendant through his shipments of signed books and Yeager was in a position to inquire quite easily about the nature of his relationship with Defendant. Therefore, the Court finds that Plaintiffs lacked diligence in inquiring into the nature of the parties' relationship and the terms of their agreement, and in bringing the claims in this suit.

*Id.* at 337-38.

As to prejudice, the district court cited authority establishing that "[u]navailable or long-lost evidence and witnesses are long recognized as prejudice-causing results of delay," *id.* at 339 (brackets and internal quotation marks omitted), and that "laches is appropriate where a plaintiff's delay is so substantial that the transaction has faded from memory," *id.* (internal quotation marks omitted). The court went on to identify just such prejudice evident in this case:

> First, it is undisputed that Yeager's first wife, Glennis, took care of his business interests during the 1980s and passed away in 1990. Glennis

would have been a critical witness to the key events at issue in this case. Similarly, employees who worked for Defendant during the relevant period are no longer with the company and may be difficult to locate. Second, the initial oral agreement took place nearly a quarter century ago and the two men who made the agreement are now both in their eighties. After more than two decades, the parties' memories of their transaction have faded. Consequently, the Court finds that Plaintiffs' decades-long delay in bringing this suit has allowed memories to dim and prejudiced Defendant's ability to defend against the claims.

*Id.* at 339-40.

The district court also addressed General Yeager's contention that the "unclean hands" doctrine precluded Fort Knox's reliance on laches. It began by citing authority explaining that the doctrine "expresses the principle that a party who comes into equity for relief must show that his conduct has been fair, equitable, and honest as to the particular controversy in issue." *Id.* at 334 (brackets, ellipses, and internal quotation marks omitted). That is, "[e]quity does not reward one who has engaged in fraud or deceit in the business under consideration, but reserves its rewards for . . . those who have come into court with clean hands." *Id.* (internal quotation marks omitted). The court then explained why this doctrine had no application here:

The Court cannot find that Defendant acted deceitfully in its dealing with Plaintiffs. Rather, the evidence before the Court indicates that Defendant branded and marketed its products using Yeager's name or likeness based on its understanding that this was acceptable to Yeager. Plaintiff has not demonstrated that Defendant undertook any effort to hide the extent to which Yeager's name and image were used to brand and market Defendant's products. To the contrary, when Yeager visited Utah in 1989, Defendant provided Yeager with a tour of its facilities and arranged for a professional photographer to photograph Yeager posing before one of Defendant's safes. . . . [W]hether or not

- 6 -

Defendant in fact breached its agreement with Yeager, Defendant did not act deceitfully or fraudulently in doing so. Therefore, the unclean hands doctrine does not bar Defendant from asserting laches.

*Id.* at 334-35.

Based on the foregoing analysis, the district court held that General Yeager's action was barred by laches and dismissed it accordingly.

## III. ISSUES ON APPEAL

General Yeager's pro se briefing purports to raise fourteen issues on appeal. Many of these do not relate to the district court's dispositive laches determination and are immaterial to our review. Such issues include factual and legal arguments regarding General Yeager's claims on the merits, which the district court did not reach, and Fort Knox's statute of limitations defense, upon which the district court did not rely.[2] There is also a great deal of redundancy with respect to the issues that are properly directed at the correctness of the laches determination. We collect and distill these scattered contentions into the several distinct issues addressed below.

### A. Material Fact Disputes

General Yeager begins his appellate argument with the general objection that the district court failed to properly account for material fact disputes. In most instances, the asserted disputes are not in fact material to the

---

[2] As explained later, there is one narrow respect in which the limitations period is relevant to the laches defense, and we consider it for that purpose.

district court's dispositive ruling on laches, and we explain that immateriality in the sections below where the points arise in connection with particular objections raised on appeal.

There is, however, one factual point emphasized by General Yeager here and throughout his briefing that (1) is clearly material to the laches issue, (2) was deemed *undisputed in his favor*, and yet (3) was left unaccounted for in the district court's analysis. This point concerns the termination of the oral agreement in 2008 or 2009—after which any claim regarding the unauthorized use of his name or likeness would turn not on decades-old events involving formation and implementation of the agreement, but on distinct events occurring very recently in relation to the filing of this action. Indeed, this point leads us to partially reverse the grant of summary judgment, as explained in the relevant portion of section E below.

## B. Elements of Laches

General Yeager challenges the district court's ruling as to both the diligence and prejudice prongs of the laches defense. With regard to diligence, he repeatedly insists there was no evidence that he actually knew Fort Knox was acting in a manner contrary to his understanding of their agreement. This argument stems from an erroneous legal premise. Laches does not require actual knowledge on the part of the dilatory party. Rather, "[l]imitations and laches begin to run from the time [the party] knew *or by reasonable inquiry*

*might have known* the relevant facts." *Ruthrauff v. Silver King W. Min. & Mill Co.*, 80 P.2d 338, 346 (Utah 1938) (emphasis added); *see also Bingham Consolidation Co. v. Groesbeck*, 105 P.3d 365, 373 (Utah App. 2004) (framing laches inquiry in terms of whether party "knew or should have known" operative facts). We agree with the district court that, whether or not General Yeager actually knew the extent to which Fort Knox was making use of his name and likeness beyond his asserted understanding of their agreement, he knew enough about its promotional activities, particularly relating to the extensive use of his autographed books to sell safes, to put him on notice to inquire into the matter decades before this suit was filed.

General Yeager also criticizes the district court's conclusion regarding evidentiary prejudice to Fort Knox as a result of his extended delay in filing. He contends that the only essential witnesses are the parties to the original oral agreement (he and Thomas James) and that, despite the intervening decades, they were able to offer their conflicting memories of the agreement. While they did offer their different views of the agreement, faded memories have also been evident. As just one telling example, Fort Knox points to General Yeager's inability to remember an incident when he posed for a photograph in front of one of Fort Knox's Yeager safes. Obviously this incident could have lent significant support to Fort Knox's position that General Yeager had agreed to promotional activities beyond simply using his name and likeness at

the yearly SCI convention.  In addition, evidence from other contemporary witnesses about communications and course-of-dealing between Fort Knox and General Yeager, particularly from General Yeager's first wife[3] and Fort Knox staff in the 1980s and 1990s, could also be important.  Such practical considerations are "long recognized as prejudice-causing results of delay," *Horne*, 289 P.3d at 512, and their import is not undercut by General Yeager's conclusory judgment that such prejudice is "a stretch," Aplt. Opening Br. at 13.

## C.  Unclean Hands

The district court properly rejected General Yeager's argument that Fort Knox did not have the "clean hands" required for assertion of a laches defense. Basically, General Yeager invoked his claims that Fort Knox had exceeded its rights under their agreement and then cited this "misconduct" as the reason Fort Knox had unclean hands.  This argument misconceives the nature of the clean-hands requirement and interjects a categorically inappropriate consideration into the laches analysis.  As the district court noted, the clean-hands inquiry looks for fraudulent and deceitful conduct, and General

---

[3] General Yeager notes that his wife was not present when the oral agreement was made and objects that it was therefore improper for the district court to consider her a material witness—an objection he characterizes as a factual dispute.  Given her marital relationship with General Yeager and her role in overseeing his business affairs in the 1980s, we see nothing improper in the district court's assessment of her potential importance as a witness.

Yeager's claims against Fort Knox, even if assumed to be meritorious, are not based on fraud.[4] In essence, General Yeager's assertion of unclean hands was just an effort to interject his arguments regarding the merits of his claims into the laches analysis. As noted earlier, this "is forbidden," because looking to the merits of belated claims to defeat a laches defense "would be antithetical to the whole point of the doctrine of laches." *Horne*, 289 P.3d at 510, 512.

On appeal, General Yeager raises allegations of concealment by Fort Knox. In his opening brief, he contends that Fort Knox's refusal of his wife's request for an accounting in 2007 shows it was hiding information about its profitable use of his name and likeness. Leaving aside questions regarding preservation of this contention,[5] it does not show concealment. General Yeager does not point to evidence suggesting Fort Knox had some obligation to do an accounting upon his request, and he cites no authority for the facially dubious notion that a company must voluntarily perform such an undertaking or be charged with hands equitably soiled by "concealment." In any event,

---

[4]  On appeal General Yeager alludes to a misrepresentation by Fort Knox about profits going to religious charity, made to induce his acceptance of the agreement. If this is meant as a fraud claim, it was not alleged in General Yeager's pleadings nor raised in his unclean-hands argument in opposition to summary judgment. We therefore do not consider it further here.

[5]  General Yeager specifically sought such an accounting in his complaint, though he did not mention it in his unclean-hands argument in opposition to summary judgment.

this allegation of concealment in 2007 is hardly material to a defense of laches arising from legal inaction beginning decades earlier.

In the same vein, General Yeager notes that Fort Knox did not send him its marketing materials over the years, and he insists that this creates a fact dispute regarding concealment. Again, he cites no evidence to indicate Fort Knox obligated itself to send him its marketing materials (or that he asked for such materials), nor does he cite authority holding the failure to voluntarily undertake such action constitutes concealment.

In his reply brief, General Yeager introduces additional allegations of concealment. Fort Knox has moved to strike his reply brief due to the belated nature of such contentions. We see no reason to strike the brief in its entirety, but we do agree with Fort Knox that these new matters raised for the first time therein are not properly before us. *See United States v. Watson*, 766 F.3d 1219, 1230 n.8 (10th Cir.), *cert. denied*, 135 S. Ct. 735 (2014).

**D.  Events within Four-Year Statute of Limitations Period**

General Yeager notes that at least two relevant events indisputably occurred within the four-year look-back period preceding the filing of this action in January 2011:  (1) Fort Knox uploaded a promotional video to the internet that referred to the Yeager line of safes; and (2) Fort Knox displayed his name and likeness at the 2009 SCI convention.  He contends that any bases for applying laches to the rest of his case do not apply to these events.  In this

- 12 -

regard, he notes in his reply brief that the Supreme Court recently held in a copyright case that claims arising within the limitations period cannot be barred by a laches defense. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 (2014). He contends *Petrella* is particularly relevant to his federal Lanham Act claim.[6]

By its own terms *Petrella*'s holding does not apply to the Lanham Act claim in this case. *Petrella* sharply distinguished between the proper use of laches to bar claims for which Congress has provided no fixed time limitation, where the doctrine performs a gap-filling function, and its improper use to bar claims timely raised within a limitations period Congress has specified (as in the Copyright Act). *See id.* at 1973-75. As *Petrella* itself pointed out, "[i]n contrast to the Copyright Act, the Lanham Act . . . contains no statute of limitations, and expressly provides for defensive use of . . . laches." *Id.* at 1974 n.15 (internal quotation marks omitted). Thus, we must look to other authority to guide our analysis of laches here.

In dealing with Lanham Act claims courts have looked to analogous state limitation provisions and invoked presumptions in favor of (or against) laches defenses to claims brought outside (or inside) the analogous limitations

---

[6]     Again, Fort Knox has moved to strike the reply brief on the ground that it raises new matters not included in General Yeager's opening brief. In this instance, we disagree. *Petrella* is relevant to arguments made in his opening brief and we see no injustice in his bringing this previously overlooked authority to our attention. In any event, the case does not control our disposition, as explained above.

period. *See, e.g.*, *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1246-47 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 57 (2014); *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011); *see also Maloney-Crawford Tank Corp. v. Rocky Mt. Natural Gas Co.*, 494 F.2d 401, 404 (10th Cir. 1974) (noting presumptions favoring/disfavoring laches by reference to analogous state limitations period in patent infringement case). This authority favors General Yeager with respect to the two claims noted above.

As a countervailing principle, Fort Knox invokes the "single publication rule," under which relief for tort claims (like defamation) premised on mass communications is unavailable for later re-publications if a claim with respect to an initial publication would be stale. *See, e.g.*, *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012). In this regard, the parties spar over such unsettled legal issues as whether this rule is available in Lanham Act cases and whether the Utah courts would recognize it for the type of state torts alleged here. They also contest whether, if otherwise available, the rule is properly applied to the particular claims noted above.

Although these matters were discussed in the parties' summary judgment materials, the district court did not address any of these questions. We think it appropriate to reverse the grant of summary judgment with respect to the two claims noted above and allow the district court to address these

- 14 -

unresolved laches issues in the first instance. We note that Fort Knox is free to challenge these claims on the basis of any other defenses it has preserved.[7]

### E. Unauthorized Use after Termination of Agreement

Application of laches is doubly problematic with respect to General Yeager's claim for unauthorized promotional activities following termination of his agreement with Fort Knox (as in its alleged use of his name and likeness at the 2009 SCI convention). That claim not only falls squarely within the limitations period, but it is not tied to any stale disputes over the nature of the 1980s agreement. It depends solely on recent events—termination of the agreement and subsequent use of General Yeager's name and likeness—for which witnesses are available and memories are not dim. For much the same reason, invocation of the single-publication rule in this regard would be inapt; the alleged wrongful conduct in 2009—acting in the complete absence of contractual authorization—is not a continuation or repetition of the earlier alleged wrongful conduct—acting in excess of authorization given by the 1980s agreement—to which laches applies.

Despite explicitly characterizing the critical fact of termination of the agreement as "undisputed," R. Vol. 8 at 336, the district court did not explain

---

[7] We note that Fort Knox has argued in its appellate briefing for affirmance on statute of limitations grounds in the event its laches defense is deemed problematic. With respect to the two facially timely claims discussed here, however, an affirmance on such grounds would only be possible if its position on the single-publication rule were definitively adopted, which just brings us back to the reasons for remand.

how a claim premised on that recent fact could possibly be barred by laches. On appeal, Fort Knox contends there is no evidence, or at least no evidence cited by General Yeager, showing that the agreement was terminated as he has alleged. But Fort Knox did not challenge that allegation in its motion for summary judgment, so it would be unfair to hold any evidentiary deficiency in this regard against General Yeager. *See Evers v. Regents of Univ. of Colo.*, 509 F.3d 1304, 1309-10 (10th Cir. 2007). That unfairness is only amplified by the fact that the district court took the lack of factual challenge by Fort Knox on this point to mean termination of the agreement was actually undisputed.

## F. Fed. R. Civ. P. 56(d) Objection

Finally, General Yeager contends the district court should have delayed ruling on summary judgment, under Rule 56(d), until he obtained additional discovery he was pursuing through several third-party subpoenas. But the magistrate judge quashed the subpoenas in question, and then denied General Yeager's subsequent motion to reopen discovery for the same purpose, months before the district court ruled on summary judgment, and General Yeager never sought review of the magistrate judge's rulings. Thus, when the district court decided summary judgment, the specific discovery underlying General Yeager's invocation of Rule 56(d) was no longer pending. Under the circumstances, the district court did not err in proceeding to rule on summary judgment.

- 16 -

## IV. CONCLUSION

We affirm the district court's grant of summary judge to Fort Knox with respect to General Yeager's stale claims (falling outside the four-year limitations period) for use of his name and likeness contrary to the limited authority granted under their 1980s agreement. As for his claims relating to conduct within the limitations period, and particularly relating to the use of his name and likeness following termination of the original agreement, we reverse and remand for further proceedings consistent with the analysis herein.

The judgment of the district court is affirmed in part, reversed in part, and remanded as explained above. Appellant's motion to file a reply brief out of time is granted. Because our consideration of the reply brief has not affected the outcome of this appeal, as a practical matter appellee's motion to strike is moot and we deny it.

Entered for the Court


Monroe G. McKay
Circuit Judge