**In re Petition of Merrill COOK, Charles A. Larsen, and Dorothy C. Larsen.**

No. 940462.

Supreme Court of Utah.

Oct. 4, 1994.

---

Ronald J. Yengich, Salt Lake City, and Gordon Strachan, Park City, for petitioners.

Jan Graham, Atty. Gen., Salt Lake City, for State of Utah.

Richard D. Wyss, Salt Lake City, for Lieutenant Governor.

M. Gay Taylor, John L. Fellows, Lisa Watts Baskin, Salt Lake City, for Office of Legislative Research.

Bill Thomas Peters, Salt Lake City, for County Clerks of Utah.

ZIMMERMAN, Chief Justice:

Petitioners Merrill Cook, Charles A. Larsen, and Dorothy C. Larsen bring this petition pursuant to section 20A–7–209 of the Utah Code and rule 65A of the Utah Rules of Civil Procedure. Petitioners allege that the ballot title and voter information pamphlet prepared by the Office of Legislative Research and General Counsel ("OLRGC") for Initiative A, Term Limits and Election By Majority Vote or By Runoff ("Initiative A"), are unsatisfactory in that they do not comply with the statutory requirement that they provide an "impartial" statement of the purpose of the measure. Utah Code Ann. §§ 20A–7–209(2)(d), 20–11a–6. Petitioners seek a preliminary injunction to halt the distribution of ballots and information booklets in their present form. We decline to grant the relief requested.

Petitioners are the sponsors of Initiative A, a statewide initiative which, if enacted, would (i) create a term limit on each congressperson and each state and county officer unless that person held office on April 15, 1993; (ii) require a run-off election after each general or special election in which no candidate received more than 50% of the vote; and (iii) apply the run-off election requirement to each office filled in the 1994 general election. Pursuant to Utah Code Ann. § 20A–7–206, petitioners delivered petitions regarding the placing of Initiative A on the ballot to all county clerks of the State of Utah. The county clerks verified the signatures on the petitions and then delivered them to the Lieutenant Governor of the State of Utah. After a statutory review of the petitions pursuant to Utah Code Ann. § 20A–7–207, the Lieutenant Governor certified Initiative A for inclusion on the ballot for the general election.

The Lieutenant Governor delivered a copy of the petition to the OLRGC for preparation of the ballot title and an impartial analysis of Initiative A. Utah Code Ann. §§ 20A–7–

209(2)(d), 20–11a–6.[1] After the OLRGC delivered the ballot title and voter information pamphlet to the Lieutenant Governor, she sent a copy of the prepared ballot title to petitioners on August 31, 1994. Letter from Lieutenant Governor to Merrill Cook (Aug. 31, 1994). Although there seems to be some dispute about how they acquired a copy of the voter information pamphlet, petitioners assert in their petition that they obtained a copy of the pamphlet on August 31, 1994.

On September 5, 1994, petitioner Cook indicated to the Lieutenant Governor via letter that he had "grave concerns" about the ballot title and offered suggestions which might overcome these objections. Letter from Merrill Cook to Lieutenant Governor (Sept. 5, 1994). In response to Cook's objections, the Lieutenant Governor indicated that she did not have the authority to alter the ballot title submitted by the OLRGC. She informed Cook that he should refer to section 20A–7–209 for an explanation of his available remedies. Letter from Kelleen Leishman to Ronald Yengich (Sept. 7, 1994).

Approximately nine days later, on September 16, 1994, the printer began producing the ballot and voter information pamphlets. On September 20, 1994, petitioners' counsel wrote to the Lieutenant Governor objecting to the ballot title and voter information pamphlet. Letter from Ronald Yengich to Lieutenant Governor (Sept. 20, 1994). Petitioners recognized that the ballots had been sent to the printer but asked the Lieutenant Governor to halt printing until this court could resolve the issue. Petitioners filed this petition on September 28, 1994.

Although petitioners challenged the ballot title in their petition, they conceded at oral argument that the ballot title was unobjectionable.[2] We agree. Because petitioners have failed to mount a serious challenge, we find that a review of the ballot title pursuant to section 20A–7–209(4) is unnecessary.

Petitioners' major contention, both in their petition and at oral argument, is that OLRGC's impartial analysis of Initiative A is neither "fair" nor "impartial." See Utah Code Ann. § 20–11a–6. Petitioners claim that the OLRGC overstated problems with the initiative in a subtle attempt to block its passage.

■ We find merit to petitioners' claim that the OLRGC's analysis of Initiative A is less than fair. For instance, Initiative A provides that persons holding public office on April 15, 1993, are not subject to its term limit requirements if they continue to seek reelection to that same office. In analyzing this provision, the OLRGC asserted, "This exception may violate the Equal Protection

---

1. Section 20A–7–209(2) provides:
   (2)(a) The Office of Legislative Research and General Counsel shall:
   (i) prepare a ballot title for the initiative; and
   (ii) return the petition and the ballot title to the lieutenant governor within 15 days after its receipt.
   (b) The ballot title may be distinct from the title of the proposed law attached to the initiative petition, and shall express, in not exceeding 100 words, the purpose of the measure.
   (c) The ballot title and the number of the measure as determined by the Office of Legislative Research and General Counsel shall be printed on the official ballot.
   (d) In preparing ballot titles, the Office of Legislative Research and General Counsel shall, to the best of its ability, give a true and impartial statement of the purpose of the measure.
   (e) The ballot title may not intentionally be an argument, or likely to create prejudice, for or against the measure.
   Section 20–11a–6 provides in relevant part:
   (1) The director of research of the legislative council, after the approval of the legislative general counsel as to legal sufficiency, shall prepare an impartial analysis of all measures submitted to the voters ..., showing the effect on existing law, the operation of the measure and the amount of any increase or decrease in revenue or cost to state or local government.... The analysis shall fairly portray the operation of the measure and its fiscal effects for the first full year of implementation....

2. The official ballot title provides:
   Shall a law be enacted to:
   (1) create a term limit on each United States Senator, United States Congressional Representative, and each state and county officer, except judges, unless that person held office on April 15, 1993;
   (2) require a run-off election after each general or special election for a federal, state, county, or other political subdivision office in which no candidate received a majority vote for the office; and
   (3) provide run-off election procedures specifically for 1994?

Clauses of the United States and Utah Constitutions." To our knowledge, there is no authority to support such an assertion.[3] The statement is pure conjecture and does not portray Initiative A in a fair and impartial light.

■ ■ Similarly, in a section analyzing that section of Initiative A which imposes a run-off election requirement for state officers and legislators, the OLRGC asserts, "The provisions of Initiative A making those state officers and legislators subject to a run-off election after the day required by the Constitution are probably unconstitutional." While we find nothing inherently improper in noting potential constitutional infirmities in pending initiatives and referenda, we note that the OLRGC is directed to do so in a fair and impartial manner. Utah Code Ann. § 20–11a–6. We do not believe that pronouncements about "probable" unconstitutionality, such as the one at issue here, are consistent with that statutory directive.

■ Although we find merit to petitioners' claims, we decline to grant the relief requested. Petitioners ask this court to exercise its inherent equitable powers to halt the distribution of the voter information pamphlets in their current form. "It is fundamental that equity aids the vigilant, not one who sleeps on his rights." 27 Am.Jur.2d *Equity* § 93 (1966); *Peck v. Monson,* 652 P.2d 1325, 1328 (Utah 1982) (Oaks, J., concurring). Here, petitioners had a copy of the ballot title and voter information pamphlet on August 31, 1994. Petitioners, however, delayed in bringing this petition until September 28, 1994. In the interim, the ballots and voter information pamphlets were sent to the printer, the voter information pamphlet was given to the press for distribution, at least some of the voter information pamphlets were distributed to the public, and an unknown number of absentee ballots were cast based thereon.

We find our decision in *Clegg v. Bennion,* 122 Utah 188, 247 P.2d 614 (1952), particularly instructive. In *Clegg,* a candidate waited thirty-two days after the filing deadline to charge that the opposition candidate had filed one day late (in honest reliance upon mistaken advice from the Secretary of State's office). In the meantime, the state convention had been held and the candidates nominated there had begun their campaigns. When the plaintiff finally mounted a challenge, the primary election deadline was imminent. In declining to grant the relief requested (i.e., deleting the late filer's name and inserting the petitioner's on the primary ballot), this court stated: "[W]e feel that [petitioner] comes to us too late. Matters of import as great as this require airing at the earliest opportunity and at a time when anticipated error may be prevented of occurrence." *Id.* at 192, 247 P.2d at 616.

The overriding importance of the public's interest in the integrity of the election process and the breadth of a court of equity's discretion in such cases is underlined by the United States Supreme Court's decision in *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Although holding that the state election laws in that case deprived a new political party of rights guaranteed in the United States Constitution, the Court held that the state was not required to place the party on the ballot for a particular election because the party's conduct of the litigation had brought the matter to the appellate court in such a form and at such a time that the requested relief would cause a "serious disruption of election process," including risk of interference with the rights of absentee and other voters. *Id.* at 35, 89 S.Ct. at 12.

These cases demonstrate that one who seeks to challenge the election process must do so at the earliest possible opportunity. *Clegg,* 122 Utah at 192, 247 P.2d at 616. Because petitioners failed to act with reasonable diligence in prosecuting this petition and because any court-ordered alteration to the voter information pamphlet could work a substantial hardship on the State, county clerks, and citizens who have cast absentee ballots, we decline to enjoin the dissemination of the pamphlets.

---

**3.** In noting the lack of precedent on this issue, we in no way express an opinion as to the legal efficacy of such a claim.

HOWE, DURHAM and RUSSON, JJ., concur.

STEWART, Associate C.J., does not participate herein.